[Civ. No. 23836.   Second Dist., Div. One.   Mar. 7, 1960.]

BANNER METALS, INC. (a Corporation), Appellant, v. WARREN H. LOCKWOOD et al., Respondents.

Gibson, Dunn & Crutcher, Richard H. Wolford, John L. Endicott and Charles E. Rickershauser, Jr., for Appellant.

Hyde, Meyer, Baldwin & Doran, Roudebush, Adrion, Brown, Corlett & Ulrich, Myron W. Ulrich, Overton, Lyman & Prince and Carl J. Schuck for Respondents.

LILLIE, J.—By way of an action for declaratory relief, and as successor in interest to the corporation by which defendant Lockwood was formerly employed, plaintiff sought a decree that it is the equitable owner of a certain invention patented by defendant Lockwood, and therefore entitled to an assignment of title and all rights and interests thereto; in the alternative, plaintiff company asked it be given "shop rights" in the invention, thereby entitling it to manufacture and otherwise use the device or item without obligation of any kind. From a judgment adverse to such claims plaintiff has appealed.

The trial was a lengthy one,—the reporter's transcript exceeding 1,600 pages, and voluminous findings covering a five-year span of events were made. These findings are not challenged as unsupported by the evidence; rather, it is contended that findings as to certain probative facts compelled a conclusion or finding of ultimate fact contrary to those conclusions reached by the trial court. This contention makes it necessary to set forth in chronological detail the various matters leading up to the present litigation; and in so doing, as we are required to do, we view the evidence in the light most favorable to defendants-respondents, resolving all conflicts and indulging all legitimate and reasonable inferences to uphold the findings of the lower court. (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689].)

Lockwood was originally employed as a salesman by a Los Angeles metal and wire manufacturing company during the

years 1947 and 1948. Subsequently, in 1950, he was hired as a salesman and sales manager for the Los Angeles operation of Coleman-Pettersen Corporation (an Ohio concern) which had acquired the assets of Lockwood's previous employer and was likewise engaged in the wire and metal fabricating business as a ''job shop,'' making specific articles in wire or sheet metal to the order of specific customers. The trial court found that Lockwood's employment contract was oral and had no definite term; that he did not, as a part of his employment, agree to assign to Coleman any invention he might conceive. In this connection it was further found that Lockwood had no duty to conceive any invention during his employment by Coleman—his duties as Coleman's sales manager were solely to sell its wire and metal products, including receptacles, to new and old customers, to contact persons and concerns to ascertain their needs for Coleman's wire and metal products and services, to contact new and old customers to attempt to sell them wire and metal products to replace, to ascertain such persons' problems in the field of wire and metal products which Coleman was able to supply, and to design possible solutions for such problems for consideration by such customers or Coleman. It was also found that Lockwood, during his employment by Coleman, performed the foregoing duties.

The record discloses that Coleman's method of operation was to take some product made by it for a particular customer and ascertain if it could be sold to other companies. This, it appears, was tried with a number of products, but the most successful was a wire and metal flat bakery tray and a delivery cart for use in handling and transporting baked goods.

In the early part of April, 1952, Lockwood commenced work in Coleman's Cleveland plant; he had been directed to instruct its Cleveland salesmen on selling the bakery items which were being sold in Los Angeles. Later that same month (April) Lockwood conceived the idea which is the basis of the patent; and, specifically, during one weekend in his motel in Cleveland he drew ''little sketches'' and silhouettes, and, after cutting them out and using pins, worked paper models of receptacles together. A few days later Lockwood was referred by his family attorney to a patent lawyer; and he made a sketch of the idea for him.

On May 23, 1952, about one month later, Lockwood took some fibreboard models to the same patent attorney. These

models, Lockwood testified, were made of materials purchased by him from Sears and Roebuck Company. The attorney was requested by Lockwood to commence work on the patent search and preparation of a patent application, for which services he paid the attorney out of his own funds. Approximately one month later he again supplied the patent attorney with three more sketches of the invention; these, he stated, had been done by him at home.

On August 15, 1952, Coleman sold substantially all its assets to Fanner Metal Products Company which, the court found, employed Lockwood "as its salesman in Cleveland" and under "no duty to invent."

On September 16, 1952, Lockwood's patent application was filed. He paid from his own funds for all legal services and disbursements in connection therewith, receiving no reimbursement therefor from anyone. As set forth in the application, the invention is one which allows two or more identical receptacles to stack one on top of another when filled, and to nest into each other when empty; an essential feature being that the nesting and stacking are accomplished without the use and without the necessity of turning the receptacle. Thereafter at home and on his own time Lockwood continued his search for a practical application of his invention and prepared a full scale drawing, on cardboard, of a receptacle incorporating his invention. In the month of April or May of 1953, also at home, Lockwood built a wooden jig, and bent wire parts to that drawing. These parts he welded together into three individual receptacles on Fanner's sample room welder after, the plant's and his own, working hours on his own time.

In April of 1953, Lockwood disclosed his invention to William Coleman, the vice president of Fanner. He explained that it was his own invention for which he had personally applied for a patent; he further stated his belief that it was an item which Fanner could exploit. According to the record, Mr. Coleman was noncommittal, expressed no interest and made no further inquiry concerning it. During the following month (May) or June, Lockwood made three more receptacles to test the structural strength of his designs. The parts for the three receptacles were formed at home, and the welding was done by Lockwood after hours on Fanner's sample welder. The wire used in all six receptacles, including the three previously made, was taken by Lockwood from Fanner's sample room and cost $4.20 for all six units. In this respect the

trial court found that the Fanner wire and equipment so used "were negligible and unimportant and in no substantial way produced or contributed to the development of a receptacle of a commercially acceptable form."

In June, 1953, Lockwood left Fanner's Cleveland plant and returned to Los Angeles. Some time prior to August 1, 1953, he discussed his further employment by Fanner in Los Angeles with Vincent Ryan, the general manager of Fanner's Los Angeles plant. At that time he informed Ryan of his invention and that he had a patent application thereon; and asserted complete and unencumbered title thereto. He further stated his belief that his invention could be a worthwhile item for Fanner to manufacture and sell and that he was interested in licensing Fanner to do so.

The court found the foregoing matters to be true and further found that Fanner's representative (Ryan) did not question Lockwood's title and expressed an interest in the invention. Relying on said expression of interest, Lockwood disclosed the invention and demonstrated the receptacle to Ryan.

In August, 1953, Lockwood's duties at Fanner included (for the first time) the establishment of standard items for general sale designated in the trade as "proprietary items." At or about this time Lockwood again demonstrated his invention and showed his patent drawings to Ryan and others. Ryan informed him that he would contact the company attorney for the purpose of working out a licensing agreement. Lockwood then gave Ryan his patent application and drawings. About one week later Ryan informed Lockwood that he wanted to postpone any discussion on the invention for two or three weeks. Lockwood handed Ryan an outline of a proposed license agreement which set forth Lockwood's ownership of the invention and the proposed royalty agreement. About three or four weeks later Lockwood again approached Ryan about the license agreement. The latter inquired if Lockwood had any potential user interested in any receptacle containing the invention. Lockwood knowing of no such potential user, Ryan then suggested that the matter "slide a little bit longer."

In September or October, 1953, Safeway Stores, Inc., had a problem involving unit delivery of merchandise to their stores. Lockwood and a Fanner engineer named Wilson endeavored to solve this problem for Safeway, but reached the conclusion that Fanner's then current products were not

suited. This precipitated an inquiry from Lockwood, in the course of the conversation with Ryan, that the Safeway problem might finally be the one to which his invention could finally be adapted. Nothing materialized at that time with respect to Lockwood's suggestion.

Soon thereafter Wilson (the Fanner engineer) developed an open rack on wheels into which the trays sold by Fanner could be placed. This rack was called "Nestline" and was incorporated into the line of items manufactured by Fanner for sale to bakeries. A patent application on this rack was filed in Wilson's name and assigned to Fanner. Lockwood then approached Ryan and suggested that if he (Lockwood) had a license, he could present his invention to Safeway in the event Nestline did not sell. As a result of this meeting, Lockwood permitted a set of samples to be made by Fanner's sample department. These samples, the court found, represented the only time and funds expended by Fanner in the development of Lockwood's invention during Lockwood's employment.

Subsequently, Lockwood's samples were shown to Safeway after the demonstration of the Nestline rack. The Safeway officials, however, appeared more interested in the latter and Ryan told Lockwood "I don't see any interest in that invention of yours. I don't know that it has any value." Wilson and Lockwood then took a trip through the northern part of California during which Nestline and other Fanner products were demonstrated. Later the two men covered the Los Angeles area. During this trip, Lockwood's containers were demonstrated, after all the other products were shown, for the purpose of ascertaining customer interest in them. No interest was shown.

Subsequently, during the summer of 1954, Lockwood devoted additional time to the development of his invention and in September of that year made four more drawings in an effort to "strengthen" the unit. The following month (October) Mr. Glezen, respondent Mid-West's president, phoned Lockwood at his office and asked if anything had been done about marketing the Lockwood invention. Glezen stated that he had an inquiry for an article in which Lockwood's invention might be used. The next month Glezen came to Los Angeles, met with Lockwood and advised the latter that he would have to study the invention to ascertain its adaptability to the use intended, as well as to assess the patent

coverage thereon. Ryan knew of this meeting . Subsequently he spent a whole afternoon with Glezen and Lockwood and registered no objection either to Mid-West or Lockwood concerning any possible patent license, nor did he assert any right, title or interest in said invention.

On November 18, 1954, Lockwood stopped at Helms Bakery on his way home from work and demonstrated his fibreboard samples to Helms representatives who showed interest in the idea. In January of the next year, Lockwood again demonstrated to Helms his receptacles with certain new variations; they were interested enough to want a quantity test. Lockwood then met with Ryan and a memorandum agreement was prepared providing in part as follows: "to permit Warren Lockwood to attempt to develop a suitable wire design of his Tierable Nesting Receptacle described in his patent application . . . and to contract with Fanner Metal Products Company to have this work done in its factory, Warren Lockwood to pay all costs of any such work performed by Fanner Metal Products Company. . . . This agreement is for the purpose of attempting to develop a possible avenue of business in Fanner Metal Products Company's regular business of job manufacturing. It is recognized that Warren Lockwood conceived and developed this idea independently and on his own time, and Fanner Metal Products Company has no title, shop right or other interest in the above mentioned invention nor patent application and none is contemplated by virtue of this agreement." Ryan took the foregoing memorandum to his attorney.

Meantime, after returning from his visit with Lockwood, Glezen had consulted Lockwood's Cleveland patent attorney and commenced structural studies on a possible bakery receptacle and cost studies thereon. In early February of 1955, Glezen's company (respondent Mid-West) determined that there was sufficient merit in Lockwood's invention to justify an attempt to develop it into a commercial article; Lockwood was accordingly invited to come to Cleveland to discuss a license. About this same time, Ryan handed Lockwood a draft of the license agreement prepared by Fanner's attorney. It was proposed therein that Lockwood was the owner and inventor of said patent, that Fanner would not contest title and that an exclusive license for the life of the patent was granted to Fanner with a percentage royalty. Further provision was made for the prosecution by Lockwood of the patent application and he was also required to defend the patent against

infringement claims. The form of this license was completely unsatisfactory to Lockwood.

On February 11, 1955, Lockwood went to Cleveland to negotiate an exclusive license with Mid-West. At the same time Lockwood gave notice to Fanner and left its employ on March 1, 1955. The trial court found that ''Lockwood left the employ of Fanner of his own volition because of the general failure of Fanner over a long period of time to exhibit any substantial interest in defendant Lockwood's said invention or in any process to complete or develop a marketable receptacle within the principles of defendant Lockwood's said invention.'' The court further found that at no time prior to the termination of Lockwood's employment with Fanner did Coleman or Fanner, either or both of them, assert any claim or right, title or interest of any kind including shop rights in or to Lockwood's invention, even though Fanner knew of the interest of Mid-West in such invention and knew of that company's conversations with Lockwood concerning a possible patent license.

Mid-West, after the execution of the license agreement with Lockwood, endeavored to design and construct a commercially acceptable bakery receptacle which would nest when empty and which would stack when full in such a fashion as to lock into a rack which could be handled as a unit. None of the samples made by Lockwood, including the three made to Lockwood's drawings by Fanner in the fall of 1953, were commercially acceptable. Mid-West finally developed a commercial receptacle which was placed into production in September, 1955. This receptacle, on which Mid-West had earlier obtained a design patent, served only the unit delivery handling of baked goods from bakery to the store and competed only with the Nestline rack among Fanner products.

On August 1, 1955, substantially all the assets of Fanner were sold to plaintiff-appellant which continued the wire manufacturing job shop in Los Angeles. In the meantime the sale of Nestline racks had been disappointing to Fanner and then Banner; finally, in the summer of 1955 without consulting Lockwood or Mid-West a program was started to try to adapt Lockwood's invention to the unit delivery problem. In the spring of 1956, this culminated in the sale of a tray with a wire super-structure incorporating Lockwood's invention to Safeway Stores in Los Angeles.

On February 26, 1957, Lockwood's patent was issued. In June of that year, at a conference of officials of Banner and Mid-West concerning the infringement of this patent, Banner

asserted a claim therein. Later that month an infringement suit was filed in Lockwood's name against Banner in the United States District Court in Cleveland; three weeks later Banner filed the present action.

Before taking up the contentions on appeal, we set forth the decisional law controlling each cause of action.    As to the right of an assignment of the patent, it is well settled that one, by merely entering an employment requiring the performance of services of a noninventive nature, does not lose his rights to any invention that he may make during the employment, although the employment may have furnished him the opportunity or occasion for the conception of an idea which may lead to a patent, and the rendition of services in the course of his employment may have so enhanced his mechanical skill, scientific knowledge and inventive faculties as to enable him to develop and perfect the idea into a patentable article; this is true even if the patent is for an improvement upon a device or process used by the employer or is of such great practical value as to supersede the devices or processes with which the employee became familiar during his employment (*National Development Co. v. Gray*, 316 Mass. 240 [55 N.E.2d 783, 153 A.L.R. 973] ).    Public policy favors the exercise by an individual of his inventive powers and seeks to stimulate the exercise of such powers by granting him the exclusive use and enjoyment of the fruits of his endeavors (*National Development Co. v. Gray, supra*).    The law looks upon an invention as the property of the one who conceived, developed and perfected it; and establishes, protects and enforces the inventor's rights in his invention unless he has contracted away those rights (*United States v. Dubilier Condenser Corp.*, 289 U.S. 178 [53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488] ).    Also, the discovery of an invention by an employee, whose duties to his employer do not require him to make any inventions, during the course of his employment through the use of the employer's equipment, materials and labors does not deprive the employee of his invention although the employer may have a shop right in the invention which gives him a nonexclusive irrevocable license to use the invention (*Barton v. Nevada Consolidated Copper Co.*, (9 Cir.) 71 F.2d 381).

    As heretofore stated, a "shop right" is the nonexclusive right to practice any invention made by the employee. [    It is the unanimous rule that the mere existence of an employer-employee relationship is not, in and of itself, suffi-

cient to entitle the employer to partake of the benefits of the employee's inventive genius. (61 A.L.R.2d 356, 363.) ██ In order to bring a shop right or similar license into existence there must be either an express agreement to this effect or there must be present certain additional circumstances from which the establishment of such right or license will be implied. ██ ·Hence, while there are instances of establishment of such a privilege by express agreement, in a great majority of the cases the privilege came into existence by implication from the circumstances of the employment, either upon the theory of an implied agreement to be determined by the intention of the parties or upon the theory of an implication which law would raise from the existing facts (61 A.L.R. 2d, *supra*, 363).

Appellant contends, as already mentioned, that the only issues on this appeal are those involving the legal effect of the controlling facts as found in the specific probative findings. In this respect, it is asserted that "(t)hese findings and undisputed facts clearly establish plaintiff's right to ownership of the patent, or at the very least, in the alternative, to shop rights." ██ While it is well established that an ultimate finding is not controlling if the specific or probative findings do not support it (*Garrison* v. *Edward Brown & Sons*, 25 Cal.2d 473, 478 [154 P.2d 377]), it is the general rule that "finding of probative facts will not control, limit or modify the finding of ultimate facts, or tend to establish that the ultimate facts were found against the evidence unless the ultimate findings are necessarily based on the probative findings and are completely overcome." (*Fitzpatrick* v. *Underwood*, 17 Cal.2d 722, 727 [112 P.2d 3].) ██ And, of course, it is likewise established that all the findings should be read together and so construed as to uphold rather than defeat the judgment. ██ Accordingly, to that end the findings are to be liberally construed and any inconsistencies are to be resolved, if reasonably possible, in favor of sustaining the judgment (*Townsend* v. *Wingler*, 114 Cal.App.2d 64, 68-69 [249 P.2d 613]).

The following probative facts found by the trial court which assertedly warrant a reversal of the judgment are summarized by appellant as follows: (1) Lockwood's duties included designing solutions to problems of customers or potential customers of his employer; (2) Lockwood's employer was in the business of designing receptacles for the storage, transport and delivery of goods; (3) Lockwood's invention was a re-

ceptacle used in the storage, transportation and delivery of goods; (4) Lockwood learned of the utility of a receptacle of the type invented by him as a result of his employment; (5) The first experimental commercial forms of the receptacle were made by Lockwood with his employer's materials and welded on his employer's premises with his employer's equipment; and (6) Lockwood negotiated the first sale of his receptacle to a customer of his employer while he was employed by appellant.

Respondent describes the foregoing findings as ''Six isolated scraps of 'evidence' or 'findings' taken out of context of this vast record ·. . . completely ignoring the evidence, and inferences therefrom, and the findings, both express and implied, that amply support this judgment.'' Included among the findings supporting the judgment appealed from, respondent lists certain allegations in the complaint which are found to be ''*untrue*'': (1) That Coleman and Fanner were engaged among other things ''in the business of inventing . . . receptacles . . .''; (2) That Lockwood was employed ''for the purpose of conceiving, and inventing'' wire and metal products including receptacles; (3) That ''in the course of and as a part of his employment with Coleman, Lockwood conceived, invented'' the invention in suit; (4) That in the ''course of the employment with Coleman, using materials furnished by Coleman, during their hours of employment, Lockwood prepared prototype and sample receptacles'' to develop and perfect the invention; (5) That in ''the course of and as a part of his employment by Fanner'' Lockwood demonstrated the receptacle, causing additional samples to be made by Fanner's sample department and ''by the use of Fanner's time, supplies and materials'' made ''substantial progress toward making said receptacles commercially useable.''

The trial court, respondents point out, also made the following affirmative findings which are said to support the judgment: (1) That Lockwood had no duty to invent; (2) That Lockwood solely conceived, invented, made and designed the invention on his own time and at his own expense and not in the course of or as a part of his employment; (3) Lockwood used no materials, equipment, services, ideas or assistance of any Coleman employees in conceiving the invention and reducing it to practice; (4) When Fanner purchased Coleman's assets, Coleman had no rights in Lockwood's invention and no such rights passed to Fanner; (5) When

appellant purchased the assets of Fanner, Lockwood's invention or any right to use of it was not an asset purchased by Fanner; (6) Appellant at no time required or had any right, title or interest or any shop right in or to Lockwood's invention; (7) Lockwood had always owned the entire work and beneficial title in and to the patent subject only to the license rights of respondent Mid-West.

Respondents maintain, and we think correctly, that the foregoing findings, both "negative" and "affirmative," were all findings of ultimate fact. Many were in the very language of the complaint and, as to each of these, appellant is "in no position to claim that it is anything other than an ultimate fact" (*Sayles* v. *County of Los Angeles*, 59 Cal.App.2d 295, 300 [138 P.2d 768]). ▆▆▆ Particularly is this true of those findings that relate to ownership or lack of ownership of the invention or shop right, for it is well established that where the court finds that a party is or is not the owner of a right or property, it is a finding of ultimate fact. (*Bloss* v. *Rahilly*, 16 Cal.2d 70, 76 [104 P.2d 1049].) The same is true of a finding that a party has no interest in certain property (*McArthur* v. *Goodwin*, 173 Cal. 499, 506 [160 P. 679]. See also *Biescar* v. *Czechoslovak-Patronat*, 145 Cal. App.2d 133, 148 [302 P.2d 104]).

Bearing on its claimed right to an assignment, appellant places great reliance on the trial court's finding that Lockwood's duties included designing solutions for the problems of his employer's customers. Says appellant: "Where an employee has the duty of inventing or developing an item, this alone constitutes the employer the equitable owner, entitled to an assignment of any patent rights." Cited as authority is *National Development Co.* v. *Gray, supra,* 55 N.E.2d 783, an "affirmance case" favoring the employer but restating certain principles, hereinbefore mentioned, consonant with the reasoning manifestly adopted by the trier of fact in the proceeding at bar. Thus, the decision in question cites with approval the earlier case of *Hapgood* v. *Hewitt*, 119 U.S. 226 [7 S.Ct. 193, 30 L.Ed. 369], where the employee was hired to develop an iron sulky plow to replace similar wooden instruments; the invention was made while he was superintendent of the Hapgood Company and at Hapgood's expense. It was held, there being substantial evidence for such a finding below, that the employee was not specifically hired to invent; hence, even though he had perfected the

658

invention on company time and with company assistance, the employee could not be compelled to assign the patent to his employer. Some 50 years later the same court affirmed this conclusion indirectly in *United States* v. *Dubilier Condenser Corp.*, 289 U.S. 178 [53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488]. There two employees of the Bureau of Standards solved the problem of remote control of bombs and torpedoes; later, applying alternative electrical current to broadcasting receiving sets, they perfected a radio device during working hours, though independent of their actual work. ▓▓▓ The court held that employment merely to design, construct, or devise methods of manufacture is not the same as employment to invent: ''One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. . . . ▓▓▓ On the other hand, if the employment be general, albeit it covers a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract is not so broadly construed as to require an assignment of the patent (*Hapgood* v. *Hewitt*, 119 U.S. 226 [7 S.Ct. 193, 30 L.Ed. 369]; *Dalzell* v. *Dueber Watch Case Mfg. Co.*, 149 U.S. 315 [13 S.Ct. 886, 37 L.Ed. 749]). In the latter case it was said: 'But a manufacturing corporation, which has employed a skilled workman, for a stated compensation, to take charge of its works, and to devote his time and services to devising and making improvements in articles there manufactured, is not entitled to a conveyance of patents obtained for inventions made by him while so employed, in the absence of express agreement to that effect'.'' (Pp. 187-188.) ▓▓▓ The court then observed: ''The reluctance of courts to imply or infer an agreement by the employee to assign his patent is due to a recognition of the peculiar nature of the act of invention. . . . Though the mental concept is embodied or realized in a mechanism or a physical or chemical aggregate, the embodiment is not the invention and is not the subject of the patent. ▓▓▓ *This distinction between the idea and its application in practice is the basis of the rule that employment merely to design or to construct or to devise methods of manufacture is not the same as employment to invent''* (Emphasis added) (p. 188). We believe the foregoing view of the law to be controlling here, despite appellant's suggestion that the dissenting opinion is better

reasoned, and the further suggestion that the case was decided under federal law and "is not of importance insofar as any *stare decisis* effect of the opinion is concerned." ▇▇▇ In *Farmland Irrigation Co.* v. *Dopplmaier,* 48 Cal.2d 208, 221 [308 P.2d 732], our Supreme Court said: "Although the question is one for determination by the law of this state, federal cases are of course persuasive authority because of the experience of the federal courts in the area of patents and patent licenses." Rather recently, also, the highest courts of New York, New Jersey and Ohio have approvingly quoted excerpts from the majority opinion in the Dubilier case (*Cahill* v. *Regan* (1959), 184 N.Y.S.2d 348 [5 N.Y.2d 292]; *Kinkade* v. *New York Shipbuilding Corp.* (1956), 21 N.J. 362 [122 A.2d 360]; *Gemco etc. Co.* v. *Henderson* (1949), 151 Ohio St. 95 [84 N.E.2d 596]).

▇▇▇ Absent any express contract to assign (and that is our case), the trial court properly declined to infer the existence of such an agreement which could arise only if the circumstances of Lockwood's employment, arguably general in nature, were broadly construed to require an assignment; this, the Dubilier case holds, should not be done. Pointing strongly to the general and noninventive nature of the employment, the record reveals an attitude of disinterest by appellant in Lockwood's invention as early as August of 1953; at that time, it will be recalled, he described his invention to William Coleman, Fanner's vice president, who was noncommittal and made no further inquiry; the subject was also discussed with Mr. Ryan, to whom Lockwood handed a form of license agreement, and the matter was subsequently held in abeyance. If appellant then believed that Lockwood's duties included the duty to invent, surely there would have been no need for any discussion about the parties' respective rights in the device or idea—the item in question would have been the employer's property since the employee merely created what he was hired to create; too, the trial court's conclusion that the appellant was not guilty of laches does not affect this particular phase of the controversy since it was expressly found that appellant at no time acquired any title in and to the invention. There is another consideration which is persuasive of the contention that equity was done in this case. ▇▇▇ While one who discovers a new principle or improvement in a machine or other device is not deprived of that discovery because he employs others to perfect the details, this is true so long as such improvements do not

depart from the original principle and purpose of the employer (153 A.L.R. 983 and cases therein collected). Here, it seems to us, the receptacle was a completely new invention, involving a principle of mechanical operation which is applicable to receptacles made of every type of material (not merely wire or sheet metal) and capable of holding nearly every type of movables such as produce, foods and metal. Instead of a new type of rack for handling baked goods, as appellant claims, it is a generic patent of broad application.

Appellant has focused attention on the finding that Lockwood had the ''duty to design.'' As was done in *Gill* v. *United States,* 160 U.S. 426 [16 S.Ct. 322, 40 L.Ed. 480], we do not care to dwell upon the niceties of the several definitions of certain words, whether they be ''develop'' (as in the Gill case) or ''design'' as in the matter at bar. Read with other findings, it seems clear that the ''duty to design'' was special and limited to specific problems ''in the field of wire and metal products which'' the employer ''was able to supply'' to the end that the same would be submitted ''for consideration'' by such customers; furthermore, the court also found that the receptacle in question was invented not to satisfy any needs of any persons contacted by Lockwood during the course of his employment.

Another specific finding, singled out by appellant, is said to compel a conclusion contrary to that ultimately reached by the trial court; it recites that the business of appellant's predecessor, Coleman, consisted at all times of ''the wire and metal fabricating business . . . among other things, the business of designing, manufacturing and selling receptacles . . . for the storage, transport of and delivery of goods and merchandise.'' Calling attention to the description in the patent of the nature of the invention, appellant then argues that it was of a type ''precisely within the heart of his employer's business.'' The answer to this argument, as respondents point out, may be found in the evidence and findings which show that as late as November of 1953, more than a year after the invention's conception, Lockwood's superior (Ryan) had no interest in the device: ''I don't see any interest in that invention of yours. I don't see that it has any value.'' These facts clearly bring the case within the reasoning of *Maurice A. Garbell, Inc.* v. *Consolidated Vultee Aircraft Corp.,* 94 F.Supp. 843, that an employer has no rights in an employee's invention when he

rejects the same as impractical.[1] As said in *Pointer* v. *Six Wheel Corp.* (9 Cir.), 177 F.2d 153, cited in the Garbell opinion, the instant contention, if sustained, would have the effect of forcing an invention upon appellant despite the previous action of its predecessor.

Appellant's remaining points as to this phase of the appeal follow the same general pattern of selecting isolated specific findings and endeavoring to establish that they are hopelessly irreconcilable with other findings reached by the trial court. We are not persuaded that any of these contentions may be sustained. ▪▪▪ Even assuming, *arguendo*, that there may be some inconsistency, "it is well settled that the mere fact that some of the probative facts are inconsistent with the ultimate facts will not prevent the ultimate from controlling where such probative facts are not shown by the findings to be the *only* facts proved and from which the court finds the ultimate facts (citation)" (*Turner* v. *Clennell*, 9 Cal. App.2d 736, 738 [50 P.2d 851]). Numerous other facts, found to be true, amply sustain the trial court's conclusion that appellant was not entitled to an assignment of the patent.

▪▪▪ We come now to appellant's claim that in the alternative it is "at the very least" entitled to shop rights. ▪▪▪ The limits of the shop right doctrine have been thus defined: Where an employee (1) during his hours of employment, (2) working with his employer's materials and appliances, (3) conceives and (4) perfects an invention for which he obtains a patent, he must accord his employer a nonexclusive right to practice the invention (*United States* v. *Dubilier Condenser Corp., supra,* 289 U.S. 178, 188). ▪▪▪ Pertinent to the above test, the trial court made the following findings: (1) that the receptacle, the same prototypes and wire models were all solely conceived, invented, made and designed by Lockwood on his own time, at his own expense and not in the course of his employment; (2) that Lockwood did not use any material or equipment of his employer or any services or ideas of other employees in conceiving the invention and reducing it to practice; (3) that Lockwood through his own patent attorney and at his own expense filed a patent application on which the patent eventually issued; (4) that the quantity and cost of the wire and other material used in the six wire models were negligible and in no substantial way contributed to the development of the receptacle.

---

[1]The reversal of the cited case by the federal appellate court was placed on other grounds (204 F.2d 946, 949, *infra*).

Appellant argues that the foregoing findings are unsupported by certain probative findings additional to those mentioned in our discussion of appellant's asserted claim to an assignment of the invention. ▮▮▮ Preliminarily, as in most matters demanding judicial resolution, "(w)hether or not the inventions are to belong to the employer is a question to be decided upon all the facts of the individual case." (Comment to Rest., Agency 2d, § 397.) ▮▮▮ Calling attention to the probative finding that the wire used on six samples was taken from Fanner's stockroom and thereafter welded in Fanner's sample room, appellant contends that the undisputed evidence in this regard nullifies the ultimate finding or conclusion that the quantity and cost of the material thus used were negligible and contributed in no substantial way to the receptacle's development. Says appellant "No principle is more established in the law of shop rights that it is not the dollar cost of what is used which gives rise to shop rights," citing *Callahan* v. *Capron*, 280 F. 254. The case is not apposite, for although "the material supplied by the defendant was of slight value, yet there is evidence that a substantial amount of the plaintiff's own time, as well as the time of a skilled tool maker, was devoted to this work at the expense of the defendant (employer)." (P. 255.)

Significance is also attached by appellant to the statement in one of the findings that Lockwood held the title of vice-president when he conceived the invention; however, this would not seem to be of material importance in the light of case law to the effect that an officer of a corporation may invent a device and, under the circumstances there present, successfully resist his company's claim of shop rights. (*Dysart* v. *Remington Rand*, 40 F.Supp. 596; *Doscher* v. *Phelps Guardant Time Lock Co.*, 89 Misc. 561 [153 N.Y.S. 710]; *Toner* v. *Sobelman*, 86 F.Supp. 369.) In *Toner* v. *Sobelman, supra*, the employee was the manager of the department in which the invention was used and his duties included the devising of plans in the field of his invention; nevertheless the trial court found, upon its evaluation of all the facts and circumstances there present, that no shop rights accrued.

We have examined appellant's authorities which assertedly require a finding of shop rights "as a matter of law." They are either distinguishable on their facts or were decided on the settled principle that substantial evidence existed in the record to support the findings of the trial court. Perhaps appellant's most-cited case is *Consolidated Vultee etc. Corp.* v. *Garbell*

(9 Cir.), 204 F.2d 946, it being claimed that this case supports the contention that "as a matter of law" the use of $4.20 worth of wire and welding equipment confers a shop right and further that an employer's disinterest in the invention is immaterial. Unlike the situation in the matter at bar, the Garbell case turned on the application of a written invention agreement which the employee had signed and under which he was required to disclose his inventions while employed. Consolidated also had the option of prosecuting a patent application and requiring an assignment to the company. In pertinent part the agreement also provided that if Consolidated "shall fail to elect in writing that it desires to prosecute a patent application on any invention or improvement" . . . within a time therein specified, "then all rights of Consolidated in and to such invention or improvement shall revert to the (employee) with the exception only that Consolidated "shall have a free shop right with respect thereto." It seems clear from a reading of the case that the results in all respects hinged on the effect of the written agreement, where as in the present matter there was no such written instrument between Lockwood and his employers for construction or consideration by the trial court.

Heretofore, we have summarized in some detail the various facts which, respondents assert, fully support the ultimate findings that no "shop rights" were here acquired. It seems to us that such findings were carefully drawn with the pronouncements of the Dubilier decision in mind. A well-reasoned analysis of the holding in that case is found in *Gemco etc. Co.* v. *Henderson,* 151 Ohio St. 95 [84 N.E.2d 596]. Referring to the statement in the Dubilier case that "where a servant, during his course of employment, working with his master's materials and appliances conceives and perfects an invention for which he obtains a patent he must accord his master a nonexclusive right to practice the invention," the court said that in describing the peculiar relationship of the employee-inventor and his employer under such circumstances, the court did not use the broad phrase "term of employment" so frequently used by the courts and construed by them to comprehend 24 hours a day during the entire employment; but that on the contrary the court had studiously avoided the use of that term and used the more limited term "during the hours of employment" to express the period of time for which the employee must account to his employer for his inventive activities. This, it would seem, effectively disposes of appellant's argument that

"(I)t is a matter of judicial notice that the creative talents of the human mind do not turn off and on during the different hours of the day . . . the exact hour at which the concept came to Lockwood cannot be controlling nor can the nature of the design be controlling."

In patent cases, findings of the trial court based upon conflicting evidence (lay or expert) must be sustained unless clearly erroneous. (*Adamson* v. *Gilliland*, 242 U.S. 350 [37 S.Ct. 169, 61 L.Ed. 356] ; *Refrigeration Engineering* v. *York Corp.* (9 Cir.), 168 F.2d 896.) A painstaking examination of this voluminous record convinces us that reasonable inferences were drawn from the great mass of evidence received on the trial of the case, and that in the last analysis factual questions were thus resolved adversely to appellant's position with which determination this court may not interfere.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 4, 1960.