Richard DEWEY, Appellant-Plaintiff,

v.

AMERICAN STAIR GLIDE CORPORA-
TION, a corporation, Respondent-De-
fendant.

No. KCD 27570.

Missouri Court of Appeals,
Kansas City District.

Oct. 11, 1977.

M. Randall Vanet, Lowe, Kokjer, Kircher, Wharton & Bowman, Kansas City, for appellant-plaintiff.

Robert L. Driscoll, Stinson, Mag, Thomson, McEvers, & Fizzell, Kansas City, for respondent-defendant.

Before SOMERVILLE, P. J., and WASSERSTROM and TURNAGE, JJ.

TURNAGE, Judge.

Richard Dewey brought suit against American Stair Glide Corporation for damages for the alleged appropriation of a novel idea by Stair Glide resulting in its unjust enrichment.

By agreement the cause was tried by the court without a jury and the court entered a judgment for Stair Glide.

On this appeal Dewey claims essentially the court erred in finding his recovery was barred by the shop right doctrine and this court should enter judgment in his favor for both actual and punitive damages. Reversed.

The trial court made findings of fact and conclusions of law. The following facts were substantially those found by the court.

Stair Glide is engaged in the manufacture of elevator chairs. These chairs, which operate on rails, are designed to accommodate persons who cannot climb stairs. The rails are affixed at the side of the stairway and the chair moves up and down by means of a cable operated by an electric motor.

In August, 1970, Stair Glide first became aware of a problem in the operation of the chair when it was notified an owner in Virginia had been thrown from the chair when a gear had stripped allowing the chair to accelerate to the bottom. Thereafter, other such failures occurred and resultant personal injuries and claims were made against the company. Eventually 32 failures were reported.

Stair Glide employed a metallurgist who examined the motors and determined the gears were underdesigned for the chair. Stair Glide realized it had about 2,000 chairs in use and it would be very difficult to trace and notify all of those customers.

Stair Glide consulted with a number of firms in an effort to have a safety device developed which could be fitted on the chairs already in use and which could be installed on new chairs as they were manufactured. However, none of these firms developed a satisfactory solution.

Stair Glide contracted with Midwest Research Institute (MRI) to help solve the problem. MRI developed a testing method to test chairs in use to determine those most likely to fail. A program was developed to test all chairs in use about October, 1970. As a result, a large number of motors were replaced. However, the need remained to develop a built-in safety device which could be installed to prevent a chair from suddenly accelerating.

MRI developed an internal safety device, but this did not prove to be the answer. During this time Stair Glide had heard proposals for everything from a large spring located at the bottom of the stairway which would allow the chair to bounce, to a dragchute to be attached to the chair. Between these extremes were all types of mechanically and electrically activated devices placed at every conceivable place on the chair and the tracks.

Dewey was employed in Stair Glide's shop as a welder on the track and frame assembly. He had been employed by Stair Glide about a year and had been a welder for about 24 years. He was not employed by Stair Glide to do any engineering or design concept work.

Dewey first learned of the problem concerning the chairs in October, 1970, through "shop talk." Dewey did not know the cause of the failures until the first part of November, 1970.

On the morning of Thursday, January 7, 1971, Dewey showed a rough sketch of a proposed safety device to Don Robertson, the general manager of Stair Glide. After looking at the sketch, both concluded it was too complicated. At about 10 minutes until 12:00 on that same day, an idea occurred to Dewey for a safety device and he gathered some scrap material around his work bench and started to make a mock up of this idea. He was soon stopped by his foreman and when Dewey told him what he was doing, the foreman informed him he was not to do that on company time. Dewey then returned to his regular duties until lunch time, but then spent his lunch hour collecting parts from the scrap barrel and built a model of his idea for a safety device. Dewey used the company welder and cutting torch as well as some of his own tools. Dewey testified employees were allowed to take home scrap parts such as he used.

The rough model was put together in about 15 or 20 minutes on Dewey's lunch break and he then went to Robertson's office and told him he wanted to show him what he had done. At the end of Dewey's lunch hour, Robertson and another employee went to Dewey's work bench where Dewey demonstrated the device. This device worked on the principle of a knurled knob being thrown against the cable so as to lock it against the striker plate. Dewey had not yet developed a triggering mechanism, that is, a way in which the knob could be thrown against the cable automatically when the chair began to accelerate. However, his device did demonstrate it was possible to snub or stop the cable in movement by forcing the knob against it. After he had viewed the demonstration, Robertson stated he liked the idea.

After Dewey had demonstrated his model, he did no further work on his idea that day, but spent the remainder of the afternoon at his regular duties. Robertson stated he had no knowledge that Dewey worked on the device on that day other than during his lunch hour between 12:00 and 12:30 P.M.

When Dewey left work he asked permission from Robertson to do work at home, but Robertson neither encouraged nor discouraged him. Dewey took the model home and called his step-son, who had some drafting training to help make a drawing of his idea. That night at home Dewey made a drawing of his safety device which he stated included all of the mechanical applications of his idea, including a triggering device.

In order to prove the day on which he had the idea and on which he made the drawing, Dewey took his drawing to a neighbor and had him and his wife sign the drawing with the time and date. Dewey returned home and made a copy of the drawing. Dewey called Robertson about 10:15 that evening and told him he had some drawings he wanted to show him the next day.

The next morning Dewey took his drawings to Robertson, but he was told he would have to show them to Schroeder, who was the engineer who worked for MRI and was assigned to the Stair Glide problem.

Later that day Dewey showed his drawing to Robertson and Schroeder and other officials of Stair Glide. At this time Dewey fully explained his idea and its operation. Incorporated in Dewey's idea was a centrifugal clutch which MRI had used in its safety device. At this time Dewey gave one copy of his drawing to his immediate supervisor who in turn showed it to Robertson and Schroeder as Dewey explained it to them. This drawing was never returned to Dewey.

After the explanation of the drawing, Robertson requested Dewey to strengthen a bar on his model. Dewey thickened the backup bar of the snubbing device and attached a pulley. He did not build a complete working model of his idea.

After Dewey had done the additional work on his model, the safety device was attached to the top of a test track and a

cable was run through the pulley and a chair was weighted with 400 pounds. The cable was then released to simulate the chair suddenly accelerating and each time the chair was stopped instantly by Dewey's safety device. Everyone was satisfied with Dewey's device, except some concern was voiced about damage to the cable when the device snubbed or stopped it.

A day or two after Friday, January 8, Dewey's immediate supervisor arranged a demonstration of the safety header device developed by Dewey. The device worked without damage to the cable. MRI was then authorized to build an initial prototype of the device.

Thomas Scofield, a patent attorney, testified the drawing made by Dewey at home was not a finished engineering drawing, but was certainly not a rough sketch. He gave as his opinion the drawing would have been entirely adequate for filing a patent application and for making complete production drawings. He stated it was his opinion Dewey's device was conceived when he formed the mental picture of the entire working device and it was perfected by the drawing which Dewey made on the evening of January 7.

On Monday, January 11, 1971, Dewey mentioned to his immediate supervisor that he wanted compensation for the use of his idea. He was informed the company had no money available for employee ideas. Dewey then consulted a patent attorney who wrote a letter to Stair Glide on January 14 notifying it of Dewey's claim to be compensated for his idea.

Upon receipt of the letter from Dewey's attorney, Stair Glide referred it to their own patent attorney. On February 17, 1971, Stair Glide was advised by its attorney that it could make full use of Dewey's idea without compensation to him because Dewey had not contributed any idea under the shop right doctrine. After receipt of this advice, Robertson decided to continue with the development of the safety header device. No production model of such device had been produced prior to that time. Thereafter the safety header device was manufactured and used by Stair Glide.

The court did not accept as true Stair Glide's evidence tending to show Dewey did not have a novel idea or contribute to the solution of the problem. Robertson testified Dewey's only contribution was to weld a few pieces together and use Robertson's idea to place the device at the top of the stairs. Stair Glide's other employees also sought to minimize Dewey's contribution. However, Schroeder testified the first idea he saw or heard about a safety device at the top of the stairs utilizing the ideas Dewey showed and demonstrated came from Dewey on January 8.

In its conclusions of law the court concluded Dewey was the originator of a novel idea and had a common law property right in it. The court further concluded Dewey had no obligation to assign his rights to this idea by virtue of his employment. The court further concluded the fact Dewey incorporated some elements of MRI's safety device did not deprive him of being the originator of a novel idea since he brought various elements into a combination for a workable unit. The court stated it found against Dewey because the safety header device was conceived and perfected to practical usable form by use of Stair Glide's time, money, materials and facilities.

■ There can be no doubt Dewey had a property right in his idea for a safety header device when this idea was reduced to a concrete form in the drawing and in the model which he made on his own time using Stair Glide's scrap material. It was stated in *Schonwald v. F. Burkart Mfg. Co.*, 356 Mo. 435, 202 S.W.2d 7, 12[2–5] (1947):

> Of course, there can be no property right in a mere abstract idea, but there may be "in a particular combination of ideas or in the form in which ideas are embodied." [*Fendler v. Morosco*, 253 N.Y. 281, 171 N.E. 56, 58.] Surely when ideas are embodied in a concrete plan for accomplishing a definite result, the one who has conceived the plan has a right to contract with reference to its disclosure and to give instructions in its use, even though

he did not originate it in the sense that no one else ever had similar ideas.

On this appeal Stair Glide does not dispute the fact Dewey had a novel idea and has a property right in it, but contends the court was correct in its application of the shop right doctrine. The leading case on the shop right doctrine is *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114 (1933).[1] Although the shop right doctrine as such was not involved in this case, the court nevertheless enunciated the doctrine which has been followed as embodying the requirements of shop right.

■ The *Dubilier* requirements for a shop right have been succinctly stated in *Banner Metals, Inc. v. Lockwood*, 178 Cal. App.2d 643, 3 Cal.Rptr. 421, 432 [22–23] (1960):

> Where an employee (1) during his hours of employment, (2) working with his employer's materials and appliances, (3) conceives and (4) perfects an invention for which he obtains a patent, he must accord his employer a non-exclusive right to practice the invention (*United States v. Dubilier Condenser Corp.*, supra, 289 U.S. 178, 188, 53 S.Ct. 554, 77 L.Ed. 1114).

Thus, if Stair Glide is entitled to a shop right, or otherwise stated, a non-exclusive license to use Dewey's idea without compensation to him, then the evidence must show Dewey conceived and perfected the safety header device during his hours of employment while working with Stair Glide's materials and appliances.

The evidence as heretofore set out reveals that Dewey did have an idea concerning the safety header device on Thursday shortly before noon. However, when he started to do some work on the idea during working hours, he was told to discontinue this activity, which he did. Thereafter the work he did was on his lunch hour, using scrap material, and using some of Stair Glide's equipment and some of his own. The idea was not fully developed at that time, and, in fact, was not fully developed until Dewey made his drawing at home Thursday night. At that time the idea was fully developed and was placed in a concrete form so that it could be utilized. Mr. Scofield, the patent attorney, testified the drawing was sufficient to form the basis for the issuance of a patent and that plant drawings could be made from it to manufacture the device. The time spent on Friday on company time was devoted to demonstrating the idea and to making minor adjustments in the model which Dewey had already constructed on his own time, and was not spent in conceiving or perfecting his idea. Furthermore, the time spent on Friday was at the specific request of Stair Glide's superintendent.

The trial court found the use of Stair Glide's time and materials on Thursday was de minimis, and Stair Glide does not contend otherwise.

Although the court found the use of Stair Glide's time and materials on Thursday was de minimis, it made no specific finding as to when Dewey conceived and perfected his idea on company time, nor when he used company materials sufficient to give rise to a shop right. The only time either could have occurred was on Friday, January 8.

The time spent on Friday, when Dewey offered to show his idea to his superiors, was spent to demonstrate that his idea functioned properly rather than in conceiving or developing the idea. By Friday, Dewey's idea was fully developed and the only thing which remained to be done was to convince his superiors his idea was a good one which would solve the problem.

■ Stair Glide does not argue in its brief what has been said to this point, but stakes its claim to a shop right on the ground Dewey's idea was not "reduced to practice" until Stair Glide had full production drawings made and caused the safety header device developed by Dewey to be manufactured. As shown above, the rule concerning shop right does not require a

1. A comprehensive review and discussion of cases involving the application of the shop right rule is found in Annotation, 61 A.L.R.2d 356 (1958).

"reduction to practice." The term "reduction to practice" is applied to inventions and has no place in the question of the application of the shop right doctrine. *Consolidated Vultee Aircraft Corp. v. Maurice A. Garbell, Inc.,* 204 F.2d 946 (9th Cir. 1953).

Stair Glide cites cases such as *Kinkade v. New York Shipbuilding Corporation,* 21 N.J. 362, 122 A.2d 360 (1956). However, *Kinkade* did not require a "reduction to practice" before the shop right doctrine would be applied. *Kinkade* applied the requirements of the shop right doctrine as set out in *Banner* and found from the facts therein the employer had obtained a shop right in the employee's invention. Likewise in other cases cited by Stair Glide, the doctrine as stated in *Banner,* which originates in *Dubilier,* was applied when the court found the facts came within the doctrine.

In this case the facts simply do not show Dewey developed his idea on company time using company materials or the time of fellow employees. The evidence unmistakably shows the idea was originated and fully developed by Dewey at home, and the work performed at the plant in developing the idea was during his lunch hour. Further time at the plant was spent on demonstrating the idea with a few minor adjustments, but not in originating and developing the idea as required to establish a shop right. The use of the small amount of company materials and equipment is not sufficient to establish a shop right. *Banner,* supra.

■ Stair Glide does not supply the deficiency in the court's findings by pointing out the exact time or materials of Stair Glide that Dewey used. Like the court, Stair Glide presents only the general conclusion that Dewey did use company time and materials. Neither has this court found any time or materials of significance used by Dewey in conceiving and perfecting his idea which belonged to Stair Glide. The court's judgment in denying recovery to Dewey because Stair Glide obtained a shop right in Dewey's idea is not supported by substantial evidence and must for that reason be set aside. *Murphy v. Carron,* 536 S.W.2d 30, 32[1-2] (Mo. banc 1976).

■ One further point which Stair Glide inferentially raises as a defense to Dewey's claim deserves mention. Dewey made his first demand for payment for any use of his idea or invention on Monday following his disclosure on Friday. When that demand was refused, his attorney wrote a demand to Stair Glide on the following Thursday. Stair Glide thereupon asked its attorney for advice on whether or not a payment to Dewey was required. It was only after Stair Glide's attorney advised use of the idea or invention could be made without compensation that Stair Glide proceeded with the full development and manufacture of the safety header device. Thus, it is clear Stair Glide, as a matter of fact, did not rely on the failure of Dewey to demand compensation on Friday when the idea was revealed. Further, Stair Glide fails to show any change in position from Friday until Monday. Stair Glide does not assert any other reason to bar recovery on this ground. In this circumstance, the failure of Dewey to demand compensation on Friday is of no consequence. *Osborn v. Boeing Airplane Company,* 309 F.2d 99, 102 n. 7 (9th Cir. 1962).

Dewey makes some argument that the court's conclusions are inconsistent. However, it is not necessary to resolve that contention, nor the contention of Stair Glide that the inconsistencies Dewey raises were the result of invited error, because this court finds the conclusion reached by the trial court is not supported by substantial evidence.

The conclusion necessarily follows that Stair Glide appropriated Dewey's idea or invention and put such to its own use.

In his petition Dewey alleged Stair Glide was unjustly enriched when it misappropriated his safety header device. He further alleged Stair Glide had converted his design. Dewey prayed actual damages in the amount of the reasonable value of the savings realized by Stair Glide in using his safety device. It is apparent Dewey has co-mingled two theories of recovery in his

pleading—a theory in contract based on unjust enrichment, and a theory in tort based on conversion.

■ A quasi contract arises from "obligations arising from 'unjust enrichment', i. e., the receipt by one person from another of a benefit, the retention of which is unjust." *Rolla Lumber Co. v. Evans*, 482 S.W.2d 519, 522[5] (Mo.App.1972).

■ On the other hand, " '[c]onversion is an *unauthorized* assumption and exercise of the right of ownership over the personal property of another to the exclusion of the owner's right. * * * ' " *Carson Union May Stern Co. v. Pennsylvania R. Co.*, 421 S.W.2d 540, 543[3] (Mo.App.1967). Of course, conversion is based upon a tort theory.

■ The measure of damages for conversion is the value of the property converted. *Roll v. Fidelity Nat. Bank & Trust Co. of Kansas City, Mo.*, 115 S.W.2d 148, 151[9] (Mo.App.1938).

A reading of Dewey's petition leaves no doubt the petition sounds in contract based on the unjust enrichment of Stair Glide for the use of Dewey's idea or invention without payment. This contract theory is clearly revealed in Dewey's prayer for actual damages based on the savings realized by Stair Glide in utilizing Dewey's safety device. Dewey prayed for an accounting in order to accurately determine the amount of savings which further indicates his theory of recovery was based on the quasi contract which resulted in Stair Glide's unjust enrichment.

More importantly, Dewey's evidence followed his pleading. He introduced evidence to show the amount Stair Glide saved by using his device. Had Dewey intended to recover on a conversion theory, he would have shown the actual value of the personal property converted, i. e., the prototype and design he drew. Both by pleading and proof Dewey has elected to attempt recovery on the theory of a breach of an implied contract. Therefore, recovery will be predicated on that theory.

The trial court, because of its judgment, did not consider the question of damages, however, the evidence concerning damages was fully presented and is contained in the voluminous transcripts before this court.

Under Rule 84.14 this court is required to give such judgment as the trial court should have given and to finally dispose of this case. This requires the assessment of the amount of damages Dewey should recover.

■ The measure of damages when the employer appropriates an idea of the employee based on the theory of unjust enrichment is the reasonable value of the use of the device and the reasonable value of the services rendered by the employee. *Matarese v. Moore-McCormack Lines*, 158 F.2d 631, 635[9, 10] (2d Cir. 1946). One method by which the reasonable value may be determined is to calculate the savings realized by the company in utilizing the device. *Matarese, supra.*

In considering the question of damages it should be noted the safety header device was not installed on new units manufactured by Stair Glide nor was the device sold by Stair Glide to any other company or individual. Stair Glide paid the full cost of the manufacture of the safety header device.

When the gear failure was first reported, Stair Glide developed a program whereby all units previously sold and installed were inspected. All units tested were rated as to the gear wear. By application of the test results to a previously devised formula, units were placed in either a safe or unsafe classification. Those which were determined to be unsafe were replaced by Stair Glide at no cost to the owner. The replacement consisted only in replacing the housing containing the motor and the gears which operated the cable by which the chair was caused to go up and down the stairs. Safety header devices were not used on those units.

Safety header devices were only placed on units which tested in a range of close proximity to unsafe rating. . It was stipulated there were 287 safety header devices installed on previously sold chairs. How-

ever, 187 of these were later removed because the safety header device had a tendency to prematurely trip and was noisy when the chair was operated. When the device prematurely tripped, it was necessary for the dealer to make a trip to the site to reset the device. It was also necessary for the dealer to replace the cable because the device proved to damage the cable when it was activated. Thus the overall result was the use of 100 safety header devices.

Stair Glide contends there is no evidence to show units on which the safety header device was installed would have been replaced if the device were not available. Though his testimony was considerably hedged when he talked about a policy of either replacing a unit or installing a device, Robertson finally conceded he followed such a policy. It is a fair inference from this concession that the installation of a device saved the installation of a new unit.

The evidence showed there was a savings to Stair Glide by installing the safety header devices over replacing the unit. The difference in the direct cost between replacing a unit with a new one and installing a safety header device, considering the cost of a new unit, the cost of the safety header device, and the cost of installation of a new unit, less the salvage realized by Stair Glide, amounted to $236.02 per unit. For the 100 safety header devices utilized, this would mean a savings to Stair Glide of $23,600. In addition, there was a savings by utilizing the safety header device in shipping, packing and installation of $25.00 per unit. This would total $2500 for the 100 units.

By utilizing the 100 safety header devices, Stair Glide did not replace that number of units which meant new units could be sold at the normal profit rather than being used as replacements with no profit to Stair Glide. This amounted to an average of $88.50 per unit over the years 1971 to 1973. This savings totaled $8,850.

In addition Stair Glide did realize some savings in travel expenses for employees involved in the replacement of units because the time involved was less for installing the safety header device than the replacement process. Further, there was undoubtedly some value to the company in having the safety header device available for immediate installation to prevent further chair failure. The failures created a rather serious situation which caused the company to immediately mount a massive effort to find a solution. Not one failure was reported in any chair in which a safety header device had been installed. Thus, the company's reputation was at least preserved to some extent by utilizing the safety header device.

The cost of the 187 units installed but later removed was to some extent offset by the value received during the period the devices were in use.

■ The direct cost savings to Stair Glide which can be definitely calculated totals $34,950. In addition, there was value which cannot be assigned a definite dollar figure. In considering all of the evidence, this court has concluded the reasonable value to Stair Glide for utilization of Dewey's idea or invention is $30,000.

■ Dewey further claims punitive damages. As already noted, Dewey's theory of recovery of actual damages is based on the contract theory of unjust enrichment. It is beyond question that punitive damages do not lie for a breach of contract. *Smith v. Piper*, 423 S.W.2d 22, 27[17–18] (Mo.App.1967). Thus, Dewey is not entitled to punitive damages.

The judgment is reversed and the cause is remanded with directions to enter a judgment in favor of Dewey and against Stair Glide and to assess Dewey's actual damages at $30,000, and to assess all costs against Stair Glide.

All concur.