Isadore YAFFE, Plaintiff-Appellant-
Respondent,

v.

AMERICAN FIXTURE, INC., Defendant-
Appellant-Respondent.

No. 47992.

Supreme Court of Missouri,
Division No. 1.

April 10, 1961.

Shifrin, Treiman, Agatstein & Schermer, Sylvan Agatstein, St. Louis, for plaintiff-appellant-respondent.

Rexford H. Caruthers, St. Louis, and Husch, Eppenberger, Donohue, Elson & Jones, St. Louis, for defendant-appellant-respondent.

HYDE, Judge.

Plaintiff sued defendant for the final six $1,000 monthly rental installments claimed to be due on a lease and had judgment for $3,300. Defendant counterclaimed for damages for breach of covenant alleged to have been caused by failure to promptly restore the leased premises after damage by a windstorm and had judgment for $14,000. Both parties have appealed and notice of appeal was filed prior to January 1, 1960.

Plaintiff made a lease of a five-floor warehouse to defendant for a term commencing April 1, 1953, and terminating March 31, 1958, with monthly payments of $1,000. The warehouse was used by defendant for storage of products manufactured by it at another location. It was damaged by a windstorm on June 11, 1957; part of the roof being blown off and part of the wall destroyed. The lease contained the following provision: "The destruction of said building or premises by fire, or the elements, or such material injury thereto as to render said premises unquestionably untenantable for thirty days shall at the option of said Lessor or Lessee produce and work a termination of this lease. If the Lessor and Lessee cannot agree as to whether said building or premises are unquestionably untenantable for thirty days, the fact shall be determined by arbitration; * * * If it is determined by arbitration or agreement between the Lessor and the Lessee that said building is not unquestionably untenantable for thirty days, then said Lessor must restore said building at Lessor's own expense with all reasonable speed and promptness and in such case a just and proportionate part of said rental shall be abated until said premsies have been restored." On June 15th, there was a heavy rain, while the building was thus exposed to the elements, causing more damage. Thereafter, tarpaulins and roofing paper were installed to provide partial temporary covering but did not prevent water from subsequent rains coming in and leaking through the upper floors into the basement, causing the floors (except the concrete basement) to buckle. The parties agreed (July 5, 1957) that the building was 45% untenantable and that portion of the rent was abated until "the building is back in satisfactory condition for normal occupancy."

The warehouse was in the Mill Creek area of St. Louis which was to be cleared of existing buildings for a municipal redevelopment project so that defendant would have to move after its lease expired. There was evidence that because of this situation, plaintiff did not decide to restore the building for some time after it was damaged but plaintiff also delayed restoration work because of a controversy with his insurance company over settlement for damages. Although plaintiff obtained a bid for making repairs from a contractor, about the middle of July, plaintiff did not claim authorization to commence work was made until about the 15th of August and the contractor said plaintiff did not order work commenced until the 18th or 19th of August. Representatives of defendant met with plaintiff on July 26th and talked about terminating the lease as of July 31st, with defendant thereafter occupying the premises as a month to month tenant at rental proportionate to the usable part of the building. Defendant claimed plaintiff orally agreed to do so and on July 29th defendant wrote a letter to plaintiff stating its

oral understanding thereof in writing, which plaintiff was asked to sign. Plaintiff did not do so and about August 15th defendant decided to move to a warehouse it had contracted to purchase in July but had not intended to occupy until its lease from plaintiff expired. Thereafter, on August 17th, defendant served a notice on plaintiff terminating the claimed month to month tenancy and also stating "that by reason of the fact that you have failed to restore the building hereinabove referred to to its condition prior to the storm damage thereto on June 11, 1957, with all reasonable speed and promptness as required by the terms of the lease of the premises above described dated January 23, 1953, between you as Lessor and American Fixture and Manufacturing Company as Lessee, the undersigned does hereby, in the event said lease was not effectually terminated by the oral agreement between you and American Fixture, Inc., made on July 26, 1957, and confirmed by the letter of American Fixture, Inc., to you dated July 29, 1957, terminate said lease as of September 30, 1957, and deliver possession of said premises to you on September 30, 1957." Plaintiff claimed the receipt of defendant's letter of July 29th, claiming a month to month tenancy, was a reason for further delay in commencing the restoration work. Defendant claimed that it could not get a definite answer from plaintiff, during June and July, as to whether repairs would ever be made; and that the first definite statement defendant received that repairs would be made was in a letter from plaintiff's attorneys dated August 29th. Plaintiff (not a witness at the trial) said, in his deposition, that repairs were not started until he made an agreement with his insurance company and that was the reason for his delay.

On plaintiff's claim for rent, defendant contends that plaintiff failed to make a submissible case, claiming the evidence showed as a matter of law a breach of plaintiff's covenant to repair "with all reasonable speed and promptness" which amounted to a constructive eviction entitling defendant to abandon the premises: Defendant claims that it did abandon the premises within a reasonable time (by September 30th) and therefore is not liable for rent after that time. Defendant also claims that, if there were fact issues as to constructive eviction, Instruction 2 was erroneous because it directed a verdict on the finding that plaintiff commenced repairs before defendant started to move and completed restoration of the walls and roof before the premises had been fully vacated by defendant. Plaintiff contends there was no constructive eviction because the work of restoration was commenced while defendant was still in possession of the premises and was completed before the premises were wholly abandoned. For the reasons hereinafter stated, our conclusion is that there were fact issues for the jury as to constructive eviction and defendant's waiver thereof.

██ "Any obstruction by the landlord of the beneficial enjoyment of the demised premises or any diminution of the consideration of the lease contract short of actual ouster may constitute constructive eviction. * * * Where a lease imposed on the landlord the duty to 'forthwith' repair damages which might be caused to the premises by fire, a failure for a period of nine days to repair operated as a breach of a condition precedent and constituted a constructive eviction of the tenant." Bennett, Law of Landlord and Tenant, citing Barbour v. Waterston, 276 Mich. 304, 267 N.W. 845; see also American Law of Property, Sec. 3.51. As stated in the latter authority, page 282: "Constructive eviction requires a substantial interference with possession or enjoyment, and the tenant must abandon the premises within a reasonable time. The basis of the latter requirement would seem to be waiver. So under particular facts it may be reasonable for the tenant to abandon the premises when a comparatively long period of time has elapsed since the initial interference, as where there is reliance on a promise of the

lessor or where it is impossible for the tenant to move."

In Lynder v. S. S. Kresge Co., 329 Mich. 359, 45 N.W.2d 319, 324, 28 A.L.R.2d 440, failure to make a promised alteration was held to be a constructive eviction, although waiver was claimed by continuance in possession with payment of rent for 23 months after the alleged breach. The court held there was no waiver because "the tenant continuously sought the removal of the stairway and it was only when the tenant became convinced that the landlord did not intend to remove the stairway that it terminated the lease and surrendered the premises." In J. C. Penney Co. v. Birrell, 95 Colo. 59, 32 P.2d 805, abandonment was not until after one year, during which time tenant paid rent under protest and not finding a place to move his store built a building for it. See also Annotations 28 A.L.R. 1448, 1475; 28 A.L.R.2d 451, 468; 32 Am.Jur., Landlord and Tenant, Secs. 246, 250, 251, 257; 52 C.J.S. Landlord and Tenant §§ 455–459. In this case, the windstorm was on June 11, 1957, and the parties agreed that 45% of the premises were made untenantable. Defendant also showed that the floors were buckled by subsequent rains, which temporary tarpaulins and roofing paper did not keep out, so as to materially interfere with moving goods by push trucks and loading and unloading merchandise through the loading dock door. Plaintiff does not claim the work of restoration of the building commenced until August 26th and the restoration of the walls and roof was not completed until September 24th. Nothing had been done to repair or relay the floors when defendant completed its removal on September 30th. (The contractor said plaintiff stopped floor restoration.) However, defendant served notice of intention to terminate the lease on August 17th, and apparently plaintiff thereafter ordered the work to be commenced. One of plaintiff's reasons for not having the work done sooner was the dispute with his insurance company, but it also might reasonably be inferred that the future of the Mill Creek area, which was to be cleared of existing buildings, had something to do with his delay. Certainly the jury could reasonably find a constructive eviction by delay of more than two months to order repairs commenced, which plaintiff knew would take five to six weeks to complete, when plaintiff should have known that defendant had great need for the entire warehouse during that season of the year, which defendant showed was its busiest.

■▆▆▆ Furthermore, we think the jury reasonably could have found there was no waiver of such constructive eviction by defendant. The cases of Delmar Investment Co. v. Blumenfield, 118 Mo.App. 308, 94 S.W. 823, and Banister Real Estate Co. v. Edwards, Mo.App., 282 S.W. 138, relied on by plaintiff, present very different fact situations and are not in point here. Defendant had evidence that its officers made constant requests for permanent repairs and received answers that "we are doing everything we can", on which the jury could have found a reasonable reliance. In July, defendant made a contract for another warehouse (outside the Mill Creek area) knowing it would have to move after its lease ended March 31, 1958. On July 29th, defendant wrote plaintiff asking for an agreement (based on a claimed oral understanding) that the lease be terminated as of July 31, 1957, and that defendant occupy the premises as a month to month tenant. When this proposition was not accepted, defendant made arrangements for obtaining earlier possession of the warehouse it had purchased and gave plaintiff written notice of the termination of the lease as of September 30th. Defendant started to vacate the premises on September 1st and completed its vacation a day or two before September 30th. We certainly cannot hold as a matter of law that defendant lost its right to terminate the lease because of a constructive eviction, because, after this notice was given and after defendant had made arrangements to move, plaintiff ordered repairs commenced and did restore the walls and the roof before defendant

had completely moved. We therefore hold that the issues of constructive eviction and waiver thereof were for the jury. From what we have said it is obvious that Instruction 2 is erroneous because, without regard to delay in commencing repairs, it authorized a verdict for plaintiff if the work of restoration, commenced before September 1st, proceeded while defendant was moving out and was completed (as to walls and roof) before defendant completed moving. Therefore the judgment for plaintiff cannot stand.

On defendant's counterclaim, plaintiff claims error, in refusing to direct a verdict for him on defendant's counterclaim, in admitting the opinion evidence, without supporting data, of defendant's officer, Fischer, as to the amount of profits lost, and in refusing testimony that defendant's letter, claiming a month to month tenancy, contributed to delay in restoration. Plaintiff also claims that the provision in the lease for abatement of rent excluded the right of defendant to recover damages for breach of covenant to make prompt repairs. Plaintiff mainly relies on our recent cases of Tnemec Co. v. North Kansas City Development Co., Mo.Sup., 290 S.W.2d 169, and Coonis v. City of Springfield, Mo.Sup., 319 S.W.2d 523. The rule established by these cases and those they cite is that anticipated profits are recoverable only when they are made reasonably certain by proof of actual facts which present data for a rational estimate of such profits. See also 15 Am.Jur. 558, Damages, Sec. 150; A.L.I. Restatement of Contracts, Sec. 331; 25 C.J.S. Damages, § 42, p. 517; § 90, p. 631. Our conclusion, for the reasons hereinafter stated, is that defendant's evidence did not meet this standard but left the amount of profits lost to speculation without substantial basis.

Defendant became a separate corporation in April 1955. Prior to that time, its business had been conducted as the fixture division of another corporation in business since 1908. Fischer became its chief financial officer in May 1955. Prior to that time

he had (since 1951) audited the accounts of its predecessor as a certified public accountant. Defendant's proof of lost profits is based on his testimony. Although he was familiar with the records of the former corporation, Fischer said he had no accurate basis for determining the profits of the division, which became the defendant corporation, prior to 1955 because of inapplicable charges between the divisions of the former corporation and later changes in accounting methods. Defendant's fiscal year ended November 30th so there was only one full year (1955–1956) prior to the year of the casualty to show defendant's experience. It was shown that, in the 1955–1956 fiscal year, defendant's total sales were $3,347,917.01, while the 1956–1957 fiscal year sales were only $2,578,177.62, but that this decrease was mainly due to the 1957 recession. In the 1955–1956 fiscal year net profits were $7,523 and in the 1956–1957 fiscal year there was a net loss of $228,641.-86. The summer and fall months were defendant's busiest and most of its sales were made during that period. They were the months which would show profits; the company expected to show a loss during the period from December 1st to June 1st.

Fischer said they computed periodically the break-even point, which he said was "the point at which your cost of products sold plus all your expenses of doing business equal the amount of dollars you receive for the merchandise which was sold and shipped to customers." He also said: "Once you get past that figure, profits mount rather quickly, below that figure they go down more quickly than percentage wise, but not as quickly as profits mount." Fischer said the sales during July were $213,000, during August $283,000 and during September $270,000. He was then asked: "Q. Based on your experience as Chief Financial Engineer, under formal operations, what would have been the profits of the American Fixture Company on that volume of sales during those months?" After objections that this called for a conclusion without proper foundation, Fischer

answered: "A. Based on our break even point at that time and taking all deviations other than this loss, which we had a portion of the warehouse into consideration, we expected to make a profit in July of $10,000.00, in August of $25,000.00, and in September of $20,000.00 which is a total of $55,000.00." He further stated that the total profits for those three months were $4,000. However, Fischer said that no record was kept of the break-even point for any month; that the break-even point was not decided on a monthly basis; that at that time it was being done more or less on a quarterly basis; and that he could not recall the break-even point for that time but that the sales were more than the break-even point. Nevertheless, Fischer produced no records nor data to show what the break-even point was for that quarter or for any quarter or for any other period. Furthermore, Fischer did not show any figures as to sales or profits for these same months in 1956 or any other year.

■ Therefore, the figures given by Fischer as to what defendant expected to make during the three months involved· were not based on proof of actual facts which present data for a rational estimate of such profits. No facts nor data were presented but only a speculative expectation or hope with no figures from which any computation could be made. See Kopff v. Deves, Mo.App., 324 S.W.2d 768. Without figures showing what the break-even point was for this period, there is nothing from which even to start a computation. Fischer said the break-even point was not even figured on a monthly basis, but on a quarterly basis, yet he stated definite amounts of expected profits for each month. There is nothing in the record to support any of these estimates. In Hargis v. Sample, Mo.Sup., 306 S.W.2d 564, relied on by defendant (loss of profits from untenantable hotel rooms) there was evidence of an estimated number of rooms not rentable, showing stated prices, the number of people turned away and the cost of supplying the rooms. We held the amount of damages could be estimated from such facts but said they should be more accurately established on retrial. Defendant also cites Giudicy v. Giudicy Marble, Terrazzo & Tile Co., Mo.Sup., 329 S.W.2d 664, an action for royalties, in which we held testimony as to method used to determine quantity of rock removed was sufficient to sustain the finding as to the quantity actually removed. In that case also facts were shown which presented data for a rational estimate, so these cases do not help defendant. The question of whether an opinion of an expert is based on and supported by sufficient facts to sustain it, is a question of law for the court. Hall v. Mercantile Trust Co., 332 Mo. 802, 59 S.W.2d 664; for other cases see West's Missouri Digest, Evidence, ☞555. We hold it was error to allow Fischer to state his conclusion as to expected monthly profits, without any facts being shown upon which to base it, and that such conclusion was not substantial evidence to show lost profits.

■ However, this does not mean, as plaintiff contends, that there must be an outright reversal of defendant's judgment on its counterclaim. Defendant did have evidence that 1957 profits were reduced by added labor costs caused by failure of plaintiff to make prompt repairs as required by the lease. It was shown that lack of warehouse space required manufactured goods to be kept in defendant's manufacturing plant, filling its aisles, interfering with its manufacturing work, impairing the efficiency of its operations and lowering its production. This condition added to its labor costs by requiring moving of merchandise by workers to get to their machines, limiting the number of items that could be produced from each machine operation, by preventing free flow of materials, and by causing inefficient handling for shipping. It also added to cost of materials used by making it necessary to buy smaller quantities at a time. Defendant also claimed excess moving costs because of these conditions and the situation at the warehouse. Defendant did have computations, made from its books

by Fischer, showing all these costs for the period June to September, inclusive, and his estimates of the normal and excess costs, from which he deducted the amount defendant received from its insurance company. However, he did not show costs for this period in any other years as a basis for this computation. Moreover, he did not allow for a reasonable time for plaintiff to repair the warehouse, which it appears was five or six weeks, and which would cut down the period for which plaintiff could be held responsible. (Cleaning up after the casualty also interrupted defendant's business for at least that length of time.) Furthermore, no facts, figures nor data were shown as a basis for estimating excess moving cost and we are not able to determine what proportion of the entire moving cost was included. Likewise, some of the labor cost was for salvaging goods in the damaged warehouse and it does not appear that this is separated in defendant's computation of labor costs. Our conclusion is that defendant does have evidence to show reduced profits for which the jury could find plaintiff liable but that its evidence was too indefinite to support the verdict rendered. We have discretion to remand for a new trial where it appears that a party has rights growing out of the transaction involved and, under the circumstances of this case, we believe we should do so.

Since this case must be retried we will rule on two of plaintiff's remaining contentions. Plaintiff argues that his agent should have been permitted to testify that he considered defendant's letter of July 29th claiming a month to month lease as terminating plaintiff's obligation to commence repairs. Plaintiff argues this as the basis of an estoppel. However, it is apparent that plaintiff did not rely on any such theory; no estoppel was pleaded but instead plaintiff stated in his answer to defendant's counterclaim that he "restored the leased premises with all reasonable speed and promptness." Therefore, this contention is inconsistent with plaintiff's theory of the case. Moreover, plaintiff's own evidence was that at all times he claimed the lease was in effect; and that, about three weeks after receiving this letter, he did order repairs made. Furthermore, plaintiff's own statement in his deposition (which was not denied) was that repairs were not started until he made an agreement with his insurance company and that was the only reason for the delay. In any event, the view of plaintiff's agent about the effect of the letter was immaterial on any issues tried. The letter was in evidence and was for the jury's consideration on the issues submitted, together with all other facts, circumstances and documents in evidence.

Plaintiff also contends that the agreement for abatement of the rent for the period during which the warehouse was only partially tenantable was exclusive of defendant's right to recover damages for breach of covenant to repair. Plaintiff argues that abatement of rent and recovery for loss of profits would be a double recovery for the same loss, citing Weiss v. Mitchell, Tex.Civ.App., 58 S.W.2d 165, 166. However, that case was not for loss of profits but was for damage to plaintiff's goods, after a fire, and it is said: "The buildings were repaired and restored to their former condition before the occurrence of any alleged damage to appellant's goods." In Oscar v. Sackville, Tex.Civ. App., 253 S.W. 651, 653, cited as authority for the statement made in Weiss v. Mitchell, supra, the plaintiff sought to recover for both loss of profits and also part of the rent previously paid, which the court said would be a double recovery because plaintiff therein "would be made whole under her contract when she recovered the loss of profits to her business, without regard to the rental value of the leased premises." In this case, defendant is not seeking to recover any of the rent paid. The reduction of rent to the proportion of the usable part of plaintiff's building was in accordance with the terms of the lease, which meant that defendant was to be relieved of paying rent for any part of the warehouse it

· could not use. However, defendant needed the entire premises and the lease required plaintiff to restore the whole building promptly for its use. We think the parties contemplated by this lease that, in case of damage to the premises, plaintiff would lose the rent for the part rendered unusable; but it also must have been recognized that, since defendant required the entire building for the efficient operation of its business, it could suffer a business loss by being deprived of it. The purpose of the agreement to promptly repair was to prevent such loss; and defendant would be entitled to recover for such a loss "without regard for the rental value of the leased premises." Under the circumstances of this case and the provisions of this lease, we hold there would be no double recovery if defendant obtains judgment for proven loss of profits caused by plaintiff's breach of his covenant to repair.

The judgment for plaintiff on its claim for rent is reversed and the judgment for defendant on its counterclaim is also reversed and the cause is remanded for a new trial on all issues.

All concur.