Lee Shell Company, Inc., Plaintiff-Appellee, v. Model Food Center, Inc., Theodore Weigley, et al., Defendants-Appellants.

Gen. No. 51,869.

First District, Fourth Division.

August 27, 1969.

Abrams, Linn, Mix & Carey, of Chicago (B. John Mix, Jr., of counsel), Hodgson, Patke & Stitt, of Chicago (Dom J. Rizzi, of counsel), for appellants.

Arvey, Hodes & Mantynband, of Chicago (Sidney R. Zatz, Howard Arvey, and Irwin I. Zatz, of counsel), for appellee.

As Modified on Petition on Rehearing.

MR. JUSTICE STAMOS delivered the opinion of the court.

Plaintiff's complaint alleged an oral contract whereby all defendants agreed to purchase $326,000 worth of store fixtures and equipment in exchange for plaintiff's promise to supply store fixtures and equipment and draw a layout for the equipment. Plaintiff alleged breach of the oral contract and claimed loss of profits in the amount of $85,000. In the alternative to the loss of profits, the plaintiff alleged in Count II that in reliance upon the assertion of all five defendants to purchase the said equipment, plaintiff did not accept business which it otherwise would have accepted and suffered $85,000 in damages for lost business. (This presumably was abandoned as the jury was not instructed on this count.) In Count III of the Complaint, plaintiff alleged that the five defendants "wrongfully appropriated" layout plans owned by plaintiff and sought damages in the sum of $25,000 for the value of the plans. This Count was not pleaded as an alternative to any other count. In Count IV, plaintiff alleged that it expended services in the preparation of the layout plans and asked damages in the value of $30,000. Count IV was not pleaded in the alternative to any other Count. Defendants' answer denied substantially all the material allegations in plaintiff's complaint. Defendants did admit however, that they requested plaintiff to furnish plumbing and electrical plans to defendants' architect for the purpose of completing the architectural plans. Instructions to the jury covered breach of express contract, implied contract, and "wrongful appropriation." The jury returned two

237

verdicts in favor of plaintiff, each giving plaintiff full recovery under all 3 Counts, one verdict in the sum of $140,000 against the four specifically named individual defendants, and one verdict awarding the plaintiff $140,000 in damages against all defendants. The court entered judgment in favor of plaintiff with respect to only one of the jury's verdicts, the one awarding plaintiff $140,000 against all of defendants.

Although defendants urge a myriad of issues for review, not all of them need be discussed in resolving this appeal. A principal issue, is whether the record supports the existence of an oral agreement as alleged by plaintiff.

Plaintiff was a corporation engaged in the business of manufacturing and distributing counters, shelving and refrigerated display cases for the merchandising requirements of supermarkets, shopping centers, drugstores, restaurants, liquor stores and other retail establishments. In the furtherance of its business, plaintiff also provided design and planning services for its customers and employed engineers and experts.

Defendant, Model Food Center, Inc., had as its principal and controlling directors, officers and shareholders, the individual defendants in this litigation.

I. W. SHELL, for the plaintiff, testified as follows:

He was president of plaintiff. He first met the defendants in 1950. In November, 1957, Weigley telephoned him and related that his family purchased a tremendous piece of land and were contemplating building a large supermarket to capture all the retail business in the neighborhood. Pursuant to this telephone conversation Weigley, Marshall and the Nemeths arrived the next morning at plaintiff's place of business and met with Shell. Weigley said he wanted to put in a diversity of departments so that he could do a $6,000,000 volume of business a year. Shell said, "This is fine, I would love

238

it, but I can't do this kind of work for you, I can't—it will take months to develop a dream of this nature, and I would be very much interested provided, of course, that you will agree to buy the equipment, that is my business, and when I get through with the plans, if you accept my plans subject to normal revisions, why, you will buy the equipment." Mr. Weigley and Mr. and Mrs. Nemeth said "of course." After this conversation the defendants and Shell visited various floors of the warehouse, factory and showrooms and viewed plaintiff's products. They discussed in detail many subjects relating to the problems, methods and vicissitudes of operating the type of venture proposed by the defendants.

Two days later the same parties met again and Shell told them he had calculated that the cost of installing the fixtures and equipment for a store of 44,000 square feet, they wanted to build, would be approximately $480,000. Weigley told Shell to start work as soon as possible, because defendants decided Shell's proposition would be acceptable and he also said that if the defendants accepted plaintiff's plans there would be no question about who was going to install the equipment.

Shell drew a plan for various departments (e. g. liquor, meat, bakery, jewelry, dry goods, restaurant, etc.) and in January, 1958, these plans were substantially completed. He and Weigley met and examined the plan, which was a layout of the store showing the various departments, locations, fixtures and equipment. Weigley "wanted to know what the price was then." The following then ensued:

Shell: ". . .
 "By the time I had actual fig-
 ures, and I gave him (Weigley)
 the figure of — — I gave him
 a proposal of $326,000.00, this

| | was the final figure, which he accepted." |
| Defendant's counsel: | "I object to that, 'he accepted.'" |
| Plaintiff's counsel: | "What did he say?" |
| The Court: | "What did he say, he accepted what?" |
| Shell: | "He accepted the blueprints." |
| Plaintiff's counsel: | "No, what did he say?" |
| Shell: | "He said that the blueprints are now satisfactory, 'and now I will sign the contract, make it ready.'" . . . |

Shell subsequently prepared a contract and a week later went to see Weigley.

Plaintiff's counsel asked Shell:

Q. "You prepared an agreement as well?"
A. "Yes."
Q. "Did you send that to him?"
A. "Yes."

At this point in the trial, plaintiff placed in evidence an artist's renderings of the delicatessen, frozen food department, snack shop, dry goods, drugstore, jewelry, grocery, etc., and Shell testified to the function and description of the fixtures and equipment to the court and jury. After this phase of the trial, the following ensued:

| | |
| Plaintiff's counsel: | "All right. Did you give this plan to Mr. Weigley?" |
| Shell: | "To Mr. Weigley, yes, sir." |
| Plaintiff's counsel: | "He received it from you?" |
| Shell: | "He received it from me, yes, sir." |
| Plaintiff's counsel: | "What did he say about this plan?" |

| | |
|---|---|
| Shell: | "He said it was terrific, just the way he wanted the store, that is the day I *asked for the order,* and he said he hadn't got his financing." |
| | (Emphasis supplied.) |

After this meeting in January he gave the final plan, after all revisions, to Weigley in March, 1958. In March, 1958, Weigley asked Shell to make up some electrical and plumbing plans. After these plans were delivered Shell again asked for the order and Weigley said he hadn't made arrangements for financing the store. Shell testified that Weigley told him:

> "Well, if you come around in a week or so, I will probably have this all cleaned up, and I will give you the order, and you can get going."

A week later Shell met Weigley again. Weigley said that he still was not ready to sign, that Shell would have to wait a week since the financing didn't come through. A week later Shell again met Weigley and he said to Weigley:

> "The order isn't in yet, and you are already getting ready to construct the building, and he (Weigley) said, 'Well, what is the use of arguing with you, Mrs. Nemeth doesn't like your plan, she doesn't like your fixtures' ". . . .

Shell related his inability to find Mrs. Nemeth either in person or by telephone. The record is devoid of evidence regarding Marshall or Mr. Nemeth's attitude.

Cross-examination of Shell was as follows:

| | |
|---|---|
| Defendant's counsel: | ". . . I understand you said you had an oral agreement with these defendants, is that right?" |

| | |
|---|---|
| Shell: | "Well, it was a contract subject to *their acceptance* of my plans, and they couldn't sign a contract at the moment, because I couldn't tell them exactly what the cost was until I finished — |
| | (Emphasis supplied.) |
| Defendant's counsel: | "Well, did you enter into any type of oral agreement with these defendants?" |
| Shell: | "Yes." |
| Defendant's counsel: | ". . . what was the date of that agreement?" |
| Shell: | "The date of the completion of my plans and their acceptance of my plans subject to several — —" |
| Defendant's counsel: | ". . . Tell us the date . . . ." |
| Shell: | "Well, the latter part of January is one date I asked for an order. I was supposed to get it and didn't get it." |

The first time he discussed price was at the second meeting in November, 1957, when he gave defendants a figure of approximately $380,000. He said the next time he discussed price was in the latter part of January, 1958, when the plans were finished except for minor revisions, at which time the final price was given to the defendants "in writing in the usual form." (This document was never produced at the trial.) Shell said there was no place for a signature on the document and he called it a prospectus or proposal showing each item of equipment that was going into the store. Shell said the proposal was furnished to defendants so they could analyze carefully and make sure every item on the proposal was desirable.

The crux of the existence or non-existence of an oral agreement is illuminated by the following colloquy:

Defendant's counsel: "Now, this amount of $326,-000.00 — —"

Shell: "Yes."

Defendant's counsel: ". . . when were you supposed to get that?"

The Court: "$326,111.00; let's be exact."

Shell: "That is correct, they were supposed to sign my contract when they accepted my plan, *and when they were supposed to accept my plan they put me off a week, then another week,* then another . . . ." (Emphasis supplied.)

OPINION

Defendants argue that plaintiff failed to prove the existence of a valid contract because (1) there was no acceptance of a contract; and (2) the material terms and conditions were too indefinite to create an enforceable contract.

The only testimony concerning an acceptance was Shell's testimony of his meetings with Weigley. The strongest of the testimony concerning the alleged acceptance was as follows:

Shell: ". . . this was the final figure, which he (Weigley) accepted.

". . .

"He (Weigley) accepted the blueprints.

". . .

"(Weigley) said the blueprints are now satisfactory, and now

243

I will sign the contract, make it ready . . . ."

The most that can be said for this testimony is that it was an acceptance of the blueprints, but surely not an acceptance of a contract.

The record does not support a theory that Weigley had authority to bind the other defendants. In fact, Shell's testimony reveals that Mrs. Nemeth expressed an utter disdain for the plan and a refusal to accept the plan. The record is silent as to manifestations of Marshall and Mr. Nemeth regarding their attitude as to an acceptance.

██ In order to create an enforceable contract, acceptance must be unequivocal. Milani v. Proesel, 15 Ill2d 423, 155 NE2d 38 (1959). The alleged acceptance or approval of the blueprints by Weigley cannot be said to be tantamount to the acceptance of an offer to sell equipment. Since there was no acceptance on the part of Weigley and since none of the other individual defendants accepted neither can there be an acceptance by the corporation, Model Food Center, Inc.

█ It is basic contract law that the terms of a contract must be reasonably certain; and when the material terms and conditions are not ascertainable no enforceable contract is created. A. S. & W. Club of Waukegan v. Drobnick, 26 Ill2d 521, 187 NE2d 247 (1963). Plaintiff in its complaint alleged:

. . . in consideration of Lee Shell Company's designing the plans for the aforesaid store and engineering the design and development of the store generally, the Lee Shell Company would receive the defendants' order for the installation of equipment *as specified in and needed for* those plans. (Emphasis supplied.)

During plaintiff's presentation of the case it introduced into evidence the plan created by plaintiff and sev-

eral artist's renderings projecting what a given area of the store would look like. Plaintiff's plan was drawn to scale and depicted the general layout of the equipment. The various pieces of equipment indicated in the plan are too numerous to enumerate in toto. The plan indicates that there will be grocery gondolas, automatic checkout counters, frozen food cases, various refrigerators, display cases, various tables, a snack shop counter and various shelving units to name but a few of the various types of the equipment indicated by the plan. The plan, however, does not describe the equipment with any specificity: there is no indication (with exception of one refrigerator display case) of the manufacture, of the quality or the type of material to be used, or the style of the equipment. The plan, although it has dimensions as to length and width of some of the equipment, does not indicate the height of the equipment. No specifications were introduced to show what the defendants were to receive for the $326,111 which the plaintiff claimed as the contract price. The artist's renderings, like the plaintiff's plan, do not describe the equipment with any specificity. Plaintiff at no time during the course of the trial introduced evidence of what equipment would be needed to equip defendants' store "as specified in and needed for" plaintiff's plan as alleged in the complaint.

Defendants' contention that the trial court erred in denying their motion for a directed verdict must be reviewed in the context of Pedrick v. Peoria & Eastern R. Co., 37 Ill2d 494, 229 NE2d 504 (1967) at page 510:

> In our judgment verdicts ought to be directed and judgments n. o. v. entered only in those cases in which all of the evidence, when viewed in its aspects most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.

■ We hold that the trial court should have granted defendants' motion for a directed verdict on Count I, the breach of contract claim. All of the evidence viewed most favorably to the plaintiff failed to establish the existence of a valid contract.

■ As to Count IV the jury was instructed that if they believed that plaintiff performed labor and services for defendants the law implies a promise to pay for such labor and services. (Plaintiff's Instruction No. 2.) The only evidence at the trial as to the alleged damages suffered by plaintiff was testimony as to the damages on the express contract and on the "wrongful appropriation" counts; no evidence was adduced as to the damages alleged under Count IV, the implied contract count. Besides failing to prove damages under Count IV counsel for plaintiff in his closing argument told the jury that he was asking them to return a guilty verdict for the breach of the contract and for the "wrongful appropriation"; there was no mention of Count IV thereby abandoning it.

Count III of plaintiff's complaint alleged that the defendants "wrongfully appropriated" plaintiff's plans and designs. Defendants answer denied that they "wrongfully appropriated" plaintiff's plan. At the trial I. W. Shell testified that after he was told that he was not going to receive the order he made several trips to the construction site of defendants' shopping center. On one occasion while he was at the construction site he noticed a copy of the plan that he had drawn on the floor which he picked up and brought back to his office. On cross-examination Shell stated that he picked up the copy of his plan from a counter and that the plan was partially opened; that he did not see any of the workmen using the plan. Shell testified that the shopping center as constructed resembled his plan although there were some changes. Defendants denied that they "wrongfully appropriated" plaintiff's plan; they contend that the plan

246

for the layout of the shopping center was conceived by Marshall and Weigley. Defendants argue that they acquired the land for the construction of the shopping center some six months before they had their first meeting with plaintiff, that at this first meeting with I. W. Shell, Weigley brought along with him the latest plan that he and Marshall had created, and that Shell's plan was similar to their plan.

While there may be some evidence to substantiate plaintiff's allegation that his plan was "wrongfully appropriated" through its use in construction of defendant corporation's building, there is no evidence that it was "wrongfully appropriated" by the individual defendants. I. W. Shell testified that his first meeting was with all four of the individual defendants, that he had a second meeting with all four defendants two days later, the remainder of Shell's testimony concerns meetings that he had with Weigley, none of the subsequent meetings testified to by Shell were attended by any of the other defendants. The plan was not however, completed until some time after the second meeting. The verdict of the jury and the judgment entered pursuant thereto found that all the defendants had "wrongfully appropriated" plaintiff's plan. We therefore reverse as to the individual defendants on all counts.

We cannot affirm the $55,000 judgment entered against the corporate defendant on Count III. Plaintiff's complaint alleged that it had suffered $25,000 damages as a result of defendants' "wrongful appropriation." At the trial I. W. Shell testified that the plaintiff suffered $55,000 damages as a result of defendants' "wrongful appropriation." Defendants made no objection throughout the course of the trial to the variance between the pleading and the proof of damages. After oral argument and submission of this case for decision in this court the plaintiff filed a motion to amend

its pleading to conform the allegation of damages to the proof. The filing of the motion was untimely, Supreme Court Rule 362 (e). Ill Rev Stats c 110A § 362(e) (1967).

■ ■ We cannot enter a remittitur to $25,000 because there was no definite proof of damages. The measure of damages for conversion is the market value of the property at the time of conversion. Sturges v. Keith, 57 Ill 451 (1870). The only evidence adduced by plaintiff was Shell's opinion of the reasonable value of the plans. In Austin v. Millspaugh & Co., 90 Miss 354, 43 So 305, 306 (1907), the court in discussing proof of value of drawings, plans and specifications which had no market value quoted from Southern Exp. Co. v. Owens, 146 Ala 412, 41 So 752 (1906):

> "Where the article lost has no market value, the rule of damages seems then to be its value to the plaintiff; and in ascertaining this value inquiry may be made into constituent elements of the cost to the plaintiff in producing it." [Citing cases.]

This principle was adopted in Flynn v. Zimmerman, 23 Ill App2d 467, 163 NE2d 568 (1960). The court there held that where stocks had no market value "[i]t was, therefore, proper for the court in arriving at its value for the purpose of ascertaining damages to consider all the circumstances of the corporation, its finances and business. The fact that personal property has no market value does not restrict the recovery to nominal damages only, its value or the plaintiff's damages must be ascertained in some other rational way, and from such elements as are attainable."

In the instant case the following testimony was presented:

248

Shell: "I had six or seven men on it all of the time. Their weekly salaries were about $250.00 a week. My overhead amounted to about $25,000.00 a month."

Mr. Zatz: "What would be a fair and reasonable charge for these plans and drawings and the work you did in designing this store?"

Mr. Mix: "I will object to that, if the Court please."

The Court: "Well, yes, there is a Count on that."

Mr. Zatz: "Yes, there is."

Mr. Mix: "I think that the witness hasn't testified that he ever charged anybody a price for a plan in his life; if he does charge, I would like to know. Then I wouldn't object."

The Court: "I know, but it wouldn't make any difference, it is a Count in his complaint that he is asking for, the reasonable value of the plan; whether he ever charged anybody else doesn't make any difference. Your objection is overruled. You may answer."

The Witness: "They are worth $55,000."

The Court: "Is that the fair and reasonable charge for the creation and design of these plans?"

The Witness: "Yes, sir."

The Court: "—in the City of Chicago on that date in 1958?"

The Witness: "That is right."

The Court: "All right."

The Witness: "That is a reasonable figure."

The figures as to overhead and salaries did not specifically demonstrate what time and effort was expended in the production of the plans, nor the relationship, if any, between his cost of production and the value of the plans. There was no foundation laid for Shell's opinion as to reasonable value. The evidence was therefore insufficient to establish damages. We therefore reverse the judgment against Model Food Center, Inc. and remand for a new trial on Count III of the complaint.

The judgment entered in the trial court is reversed and the cause is remanded for a new trial on Count III as to the corporate defendant only.

Reversed and remanded.

DRUCKER, P. J. and ENGLISH, J., concur.