Gene OSTER, Plaintiff-Respondent,

v.

KRIBS FORD, INC.,
Defendant-Appellant.

No. 44788.

Missouri Court of Appeals,
Eastern District,
Division One.

Sept. 27, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 15, 1983.

Application to Transfer Denied
Dec. 20, 1983.

Martin Schiff, Jr., Clayton, for plaintiff-respondent.

Albert A. Michenfelder, Steven W. Koslovsky, Clayton, Charles S. Sigoloff, Sigoloff & Sigoloff, St. Louis, for defendant-appellant.

SIMON, Presiding Judge.

Plaintiff brought suit against his former employer, Kribs Ford, Inc., for conversion of business records which he had compiled during his employment with Kribs. The trial court originally dismissed the plain-

tiff's suit for failure to state a claim on which relief could be granted, finding that the records in question belong to the employer under the "shop rights" rule. *See Dewey v. American Stair Glide Corp.*, 557 S.W.2d 643 (Mo.App.1977). The Supreme Court reversed the dismissal holding that the plaintiff's petition alleged facts which, if proven at trial, would show that a custom existed with respect to the employment contract making the records in question the property of the plaintiff and thereby bringing the claim within an exception to the general "shop rights" rule. *Oster v. Kribs Ford, Inc.*, 611 S.W.2d 535 (Mo.1981). The case was remanded for trial and the plaintiff secured a favorable jury verdict of $30,-000 in actual damages and $61,000 in punitive damages. Defendant appeals this judgment. We affirm.

On appeal, defendant contends that: (1) the trial court erred in submitting MAI 3.01 (1981 Revision) to the jury without deleting the bracketed language "[or defense]" since no affirmative defense was raised; (2) the plaintiff failed to establish that the defendant was guilty of legal malice, as is necessary for an award of punitive damages; (3) plaintiff failed to provide a link between the defendant's retention of the records and any loss suffered by plaintiff and consequently there was no basis for granting actual damages; and (4) plaintiff failed to establish the existence of any agreement concerning the records, which is required before custom and practice can have any effect upon their ownership.

Plaintiff was employed by defendant, a Ford dealership, from 1960 to 1976, except for approximately one week in 1971 when he worked for another car dealer. Plaintiff began work with defendant as a new car salesman and continued in that capacity until 1974 when he was promoted to assistant sales manager, a position he held until he left in 1976. As an assistant sales manager the plaintiff still occasionally sold automobiles, though his chief responsibility was the supervision of other salesmen.

During the period of plaintiff's employment, defendant utilized an invoice packet to record its sales transactions. This packet consisted of an original and three carbon copies of a form used to record the name and address of the customer, the name of the salesman, date of sale, make and model of the car, the accessories on the car and the terms of sale. When a sale was completed, copies of this form were distributed to the front office, the billing clerk, the salesman and the customer.

Salesmen at Kribs were paid once a month exclusively by commission and their copy of the sales invoice provided a means of checking the amount of their paycheck against their own sales records. The salesmen were also encouraged and sometimes required to use these sales slips to contact customers after a sale to insure that the customer was satisfied and to promote future sales. This follow-up procedure is viewed as beneficial to both the dealership and the salesman in that it is a potential source of additional sales for the dealership and additional commissions for the salesman. The character and intensity of these follow-ups varied among salesmen. Some salesmen wrote their own notes on their invoice copies for additional aid in follow-ups. The invoice slips also help salesmen maintain personal contact with their customers. Building a good rapport with one's customers and establishing a personal clientele are generally regarded as valuable practices for salesmen in the car sales business, and such practices are generally expected of the salesmen. It is also a generally accepted practice in the business for salesmen to maintain contact with their past customers after changing dealerships. Prior to the incident with the plaintiff, the invoice copies distributed to salesmen at Kribs were made available to the salesmen for all of the foregoing purposes.

In March, 1976, the plaintiff informed the sales manager at Kribs, Mr. Seeck, that he intended to leave Kribs to accept the position of sales manager at another dealership. The plaintiff testified that his reason for deciding to leave Kribs was he perceived that there was little chance of an opening in the sales manager position at Kribs in

the near future and, therefore, to achieve the promotion he desired he felt it was necessary to go to another dealership. Mr. Seeck, at first alone and later in concert with Jack Kribs, the president of Kribs Ford, unsuccessfully attempted to dissuade the plaintiff from leaving Kribs. The plaintiff had in three separate years received a prestigious award from Ford Motor Company for being the top new car salesman in the country for Ford cars and the management at Kribs was admittedly very interested in having the plaintiff remain at Kribs. The plaintiff testified that the attempts to persuade him to stay became heated and when he continued to stand by his decision to leave Bernie Seeck informed him that "you are not leaving with your records." The plaintiff further testified that he attempted to persuade Mr. Seeck and Jack Kribs, president of Kribs Ford, to allow him to leave with the records, but the two men remained adamant in their refusal and did not give a justification or excuse for their decision. Mr. Seeck and Jack Kribs accompanied the plaintiff to his office and took possession of the sales records as the plaintiff gathered the rest of his possessions and left. Later that summer the plaintiff made some inquiries at Kribs as to the possibility of recovering his sales records, and the plaintiff testified that Jack Kribs told him, "The only way you can get your records is to sue me." In October, 1976, the plaintiff sent a written request to the defendant asking for the return of his sales slips. In November, 1976, the defendant's attorney sent a response stating that he had advised the defendant that it was under no obligation to surrender the records. At the time of trial the defendant could not account for the whereabouts of the records.

There was no express agreement, written or oral, between the parties concerning the ownership of the records, nor had the defendant ever made such an agreement with any of its salesmen prior to the incident with the plaintiff. The plaintiff introduced evidence tending to show that a custom and practice existed at Kribs, and most of the car dealerships in the area, allowing sales-men to retain and make use of their sales slips in any manner they desired, including taking the sales slips along with them when they transferred to another dealership. The plaintiff's evidence also showed that salesmen in general rely on this custom and practice insofar as they forego making their own records of their sales understanding that the invoice copies issued to them can be used as they see fit.

The defendant countered with evidence that some St. Louis dealerships do not distribute sales invoice copies to their salesmen as is done at Kribs Ford. In each of the examples presented by the defendant, however, the salesmen were either encouraged to keep their own records of their sales transactions or they were furnished records other than sales invoices which listed the customers to whom they sold cars, and in any event in no case mentioned was there ever any attempt made to prevent a salesman from taking a list of his customers with him when transferring to another dealership.

Mr. Seeck and Jack Kribs testified that the reason they withheld the plaintiff's records from him was because he was going to a competitive Ford dealership to be the sales manager and would be in a position to distribute his sales slips to other salesmen, since he would be making very few direct sales himself. Jack Kribs and Mr. Seeck stated that Kribs Ford would not have prevented the plaintiff from taking along his sales slips to another dealership if he were going to be a salesman, but since the plaintiff would not be able to use the slips himself, Kribs Ford did not want the slips made available for the general benefit of a competitive dealership. William Kribs, chairman of the board of Kribs Ford, testified, however, that management at Kribs Ford was generally not concerned with what salesmen did with their invoice copies since management retained a copy itself and since it did not believe that the invoice copies were of any great value to the salesmen.

The invoice copies taken from the plaintiff were the only record he had of his

customers from past sales for the time period covered by the records. Some of these sales slips included notes taken by the plaintiff in regards to follow-up contacts made with customers. The plaintiff stated he felt no need to make any other record of the information contained on the slips because of the longstanding practice at Kribs Ford of permitting salesmen to retain their invoice copies.

Plaintiff concedes that the sales slips have no general market value, but the testimony of both the plaintiff's and defendant's witnesses recognized that the slips may be valuable to the salesmen in making future sales. The evidence showed that the slips were the source of sales to past customers, as well as the friends and relatives of past customers. One salesman testified that he had calculated the percentage of his sales over a four year period which were attributable to past customers and found that it ranged from 51 to 70 percent. Another salesman provided evidence showing that past customers continued to be a source of sales after a salesman changed dealerships. His records showed that between 25 to 30 percent of his sales following a change of dealerships were attributable to customers acquired prior to joining the new dealership. The defendant and many other dealerships encourage and sometimes require their salesmen to utilize the slips to generate sales. Also, the defendant was one of several dealerships which utilized an expensive computer system to efficiently handle information on sales and customers. The plaintiff's and defendant's witnesses agreed that there was no way to attach a precise value to the sales slips and that the value of the slips would vary among salesmen depending on how well the slips were utilized.

After leaving Kribs Ford, the plaintiff worked as sales manager for another St. Louis Ford dealer for about one year. He then went to work for a St. Louis Oldsmobile dealership as a salesman. The plaintiff testified that he earned $36,000 as a salesman in 1978, $40,000 in 1979, $49,000 in 1980 and he earned $20,000 in 1981 at the time of trial in June. The plaintiff kept a separate personal record of the number of automobiles he had sold each year and from this he was able to calculate the percentage of his sales made to former customers and the friends and relatives of former customers. For the period of 1971 through 1975 approximately 45 percent of the plaintiff's sales were made to or obtained through former customers.

■ We will address the defendant's points in the reverse order in which they were presented. In his fourth point defendant contends that custom and practice can only have a bearing upon a contract when it is used to clear an ambiguity surrounding some term which is explicitly addressed in the contract. Defendant argues that the question of ownership of the plaintiff's invoice copy was not explicitly addressed in any agreement between the parties, and therefore, the custom and practice established by the plaintiff is not sufficient to negate the general "shop rights" rule under which the employer is the owner of an employee's business records. The defendant cites the following cases as authority for its position: *Buxton v. Harsh,* 631 S.W.2d 95 (Mo.App.1982); *Heiden v. General Motors Corp.,* 567 S.W.2d 401 (Mo.App. 1978); and *Burns v. Lewis-Howe Co.,* 266 S.W.2d 14 (Mo.App.1954).

In *Buxton,* the court simply held that a custom and usage could not in itself create a contract when there was none previously. *Id.* at 97. In so holding the court expressly recognized that custom and usage could supply a term omitted from a contract. *Id.* at 97–98.

In *Heiden,* the parties entered into a lawsuit settlement and filed a stipulation for dismissal with the circuit court "at defendant's costs." The plaintiffs later brought another lawsuit against the defendant over a disagreement as to the meaning of the word "costs" in the parties' settlement agreement. The plaintiffs had paid $2,339.30 in court reporter fees, but they only received $1,295.10 from the defendant, which represented the amount to be charged by court reporters according to a statutory fee schedule. The plaintiffs

claimed that the defendant was aware of a custom and practice whereby court reporters would not agree to do depositions for payment according to the statutory fee schedule, and the plaintiffs argued that the parties' understanding of, and reliance on, this custom should control the interpretation of the word "costs" in their agreement.

The court in *Heiden* recognized that custom and usage can have a bearing upon the interpretation of an agreement. The court focused, however, on the rule of contract construction that a term appearing in a contract for which there is a statutory definition is given the meaning prescribed by the statute unless the parties expressly agree otherwise. After adopting this rule of construction the court went on to hold that a custom and usage could not be used to alter the plain meaning of a contract term. Thus, with respect to custom and usage, the court's holding was limited to its refusal to allow custom and usage to alter an unambiguous term in a contract. *Id.* at 403–05. In the present case there were no contractual terms contradicting the plaintiff's proffered custom and practice.

In *Burns,* the plaintiff did not base her claim upon custom and practice, but rather, she argued that the parties had an express agreement. The court in *Burns* found that there was no express agreement as alleged by plaintiff and it made no reference to the applicability of any custom or practice. *Id.* at 14.

The case providing the applicable law for the issue raised here is *State v. Nangle,* 405 S.W.2d 501 (Mo.App.1966). The court in *Nangle* stated: "Missouri cases hold that customs and usages *may,* by implication, become part of the parties' contract." The court quoted a portion of § 246 of the Restatement of the Law of Contracts with approval: "Operative usages have the effect of ... adding to the agreement ... provisions in accordance with the usage, and not inconsistent with the agreement...." *Id.* at 504. The Supreme Court referred to *Nangle* as the proper foundation for the plaintiff's cause of action when it reversed the dismissal of the plaintiff's suit. *Oster v. Kribs,* 611 S.W.2d 535, 536 (Mo.1981). The defendant's fourth point is without merit.

In its third point defendant contends that the plaintiff failed to provide a link between the defendant's retention of the records and any loss suffered by the plaintiff, and consequently there is no basis for granting actual damages. More specifically, defendant argues that plaintiff's steady increase in salary after leaving Kribs demonstrates that the plaintiff has suffered no loss on account of the missing records and further, although plaintiff has produced evidence showing the percentage of his past sales attributable to past customers, plaintiff has not shown what portion, if any, of these sales were obtained through use of his sales records.

■ The general measure of damages for conversion is the market value of the property converted. *Dewey v. American Stair Glide Corp.,* 557 S.W.2d 643, 649 (Mo.App. 1977). If the converted property has no market value, then an alternate measure of damages is the value of the property to the owner, excluding any fanciful or sentimental value that the property may have. *Oliver v. Oliver,* 508 S.W.2d 209, 211 (Mo.App. 1974). Since it is agreed that the plaintiff's sales records have no general market value, the plaintiff's damages must be measured in terms of the value of the records to him.

■ The defendant's assertion that because the plaintiff's salary increased following the defendant's tortious conduct the plaintiff suffered no loss is without merit. The plaintiff may recover lost profits or earnings resulting from actionable conduct as long as the losses " 'are made reasonably certain by proof of actual facts which present data for a rational estimate.' " *Baker v. Pasley Manufacturing and Distributing Co.,* 413 S.W.2d 268, 270 (Mo.1967) (quoting *Yaffe v. American Fixture, Inc.,* 345 S.W.2d 195, 199 (Mo.1961). The mere fact the plaintiff's commission income rose following the conversion does not rule out the possibility that it could have been greater if the plaintiff had been able to utilize his records.

As evidence of his damages the plaintiff was able to provide the percentage of his past sales attributable to past customers and his commission income following the confiscation of his sales records. The reasonableness of the plaintiff's percentage figures was supported by a showing that other salesmen had calculated similar percentages from their sales records. There was also abundant testimony concerning the general value of past sales information in obtaining future sales.

The parties agree and our research shows that there are no Missouri cases which address the issue of actual damages under the circumstances presented here. The defendant cites three Illinois cases which it contends deny damages for being too speculative under circumstances analogous to those present here. *See Long v. Arthur Rubloff & Co.,* 27 Ill.App.3d 1013, 327 N.E.2d 346 (1975); *Lee Shell Company, Inc. v. Model Food Center, Inc.,* 111 Ill.App.2d 235, 250 N.E.2d 666 (1969); *Williams v. Board of Education of Clinton Community,* 52 Ill. App.3d 328, 10 Ill.Dec. 161, 367 N.E.2d 549 (1977). These cases are, however, distinguishable from this case in that the only evidence of damages presented in these cases was the plaintiff's unsupported opinion of what the converted property was worth to the plaintiff; whereas here the plaintiff was able to supply figures and percentages relevant to the value of the property, as well as the supporting testimony of other salesmen.

*Long v. Arthur Rubloff & Co.* involved a real estate broker who sued his former employer for conversion of his personal business records which aided him in arranging lease contracts. In addressing the issue of damages the court stated that the plaintiff had the burden of establishing the value of the records "by such proof as the circumstances admit." *Id.,* 327 N.E.2d at 355. In commenting on the plaintiff's failure to meet this burden the court went on to say:

[o]ther than plaintiff's opinion, there was absolutely no testimony from which the trier of fact could determine the value of the leasing data to plaintiff. No testimony was offered to show what value the leasing data had been to plaintiff in the past, what commissions, if any, were made by use of the data, or other testimony to show how possession of the book economically benefited plaintiff. *Id.*

The evidence in *Lee Shell Company, Inc.* and *Williams* of the value of the converted property was similarly lacking.

The $30,000 granted by the jury for compensatory damages is equal to approximately 20% of the plaintiff's sales commission income calculated from the time he left work at Kribs until the time of trial, and if the $30,000 is figured into the plaintiff's commission income for this time period it would equal approximately 17% of that income.[1] It should be noted that these percentages would be even smaller if sales following the trial and future sales were considered. Viewed in this light we cannot say that the jury award was unreasonable or too speculative given the circumstances and the evidence presented. The plaintiff demonstrated that over a five year period approximately 45% of his sales were attributable to past customers. Another salesman produced records showing that the annual percentage of his sales attributable to former buyers ranged from 50% to 70%, and still another salesman showed that 25% to 30% of his sales following a transfer to a new dealership were obtained through customers he had acquired before the transfer. These figures, together with the evidence given showing the significance placed upon former buyers as a source of sales by salesmen and dealerships, supply an adequate basis for the jury's damage award. The plaintiff's proof of value was as good as the circumstances permitted, and the jury's award was within the reasonable limits of that proof.

---

1. After the plaintiff left Kribs in 1976 and prior to trial he earned $145,000 in sales commissions—$36,000 in 1978, $40,000 in 1979, $49,-000 in 1980 and $20,000 by the time of trial in 1981, and if the $30,000 is taken as commission which the plaintiff would have earned with the use of his records the total for this period would have been $175,000.

In its second point defendant contends that the plaintiff failed to establish that it was guilty of legal malice, as is necessary for an award of punitive damages. To be guilty of legal malice the defendant must have intentionally committed a wrongful act without just cause or excuse. Defendant must know the act was wrongful or that it was done with reckless disregard for the plaintiff's rights. *Price v. Ford Motor Credit Co.,* 530 S.W.2d 249, 253 (Mo.App.1975). Defendant argues that it was acting under the advice of legal counsel when it refused to return the records, and as such it could not have believed that its actions were wrongful. Also, the defendant claims that the original dismissal of the plaintiff's suit for failure to state a claim on which relief could be granted, which was affirmed by this court, demonstrates the genuine confusion which, by itself, should remove any inference that the defendant knew its actions were wrongful.

The defendant's contention that it could not have known its actions were wrongful since it was acting under the advice of legal counsel is without merit. The advice of legal counsel which the defendant refers to was obtained after the defendant received a letter from the plaintiff's attorney in October, 1976, requesting the return of the records. Prior to this time the defendant had already confiscated the plaintiff's records and had refused to return them, and thus the conversion had already occurred. *See Houston v. Columbia Federal Savings & Loan Ass'n,* 569 S.W.2d 211, 214 (Mo.App.1978). For purposes of determining punitive damages, the defendant's intent at the time the wrongful act was committed is determinative of whether the defendant is guilty of legal malice. *See Labrier v. Anheuser Ford, Inc.,* 621 S.W.2d 51, 58 (Mo. banc 1981). Since the defendant obtained the advice of legal counsel after it had committed the wrongful act, this advice has no bearing upon the issue of whether the defendant was guilty of legal malice.

The fact that it was originally held that the plaintiff failed to state a cause of action is also insufficient to excuse the defendant of legal malice. The original dismissal was the result of the court's failure to recognize the parties' ability to negate the "shop rights" rule by means of supplying contract terms by longstanding custom and practice. By its verdict the jury reasonably found that the defendant knew it was acting contrary to the parties' understanding and intentions concerning their employment agreement when it withheld the plaintiff's records. Furthermore, the jury found that the defendant knew that the plaintiff had relied upon the parties' understanding concerning the ownership of the sales slips when he accepted employment with the defendant.[2] There was sufficient evidence to support the finding that the defendant had the knowledge required to charge it with legal malice, as long as the defendant did not have a justification or excuse for its action. *Labrier v. Anheuser Ford, Inc.,* 621 S.W.2d 51, 58 (Mo. banc 1981).

The defendant attempted to justify treating the plaintiff differently than other salesmen who had left the dealership by noting that the plaintiff was leaving to become a sales manager, as opposed to a salesman, at a competitor dealership. The defendant maintained that this distinction was significant because as a sales manager, the plaintiff would have little use for the sales slips personally, but he could distribute them to salesmen under his supervision for the general benefit of the dealership. The defendant claimed that the possibility the slips would be used in this fashion prompted it to withhold them from the plaintiff.

The defendant's concern that the sales slips would constitute a greater competitive threat in the hands of a sales manager as opposed to a salesman is not persuasive. There was uncontroverted evidence that a salesman's customer list is more valuable to

---

2. As noted in the recitation of facts, supra, Mr. Seeck, Kribs' sales manager, told plaintiff "you are not leaving with your records" and Jack Kribs said, "The only way you can get your records is to sue me."

the salesman who complied the list than a salesman who is given the list by another. This suggests that a customer list could be better utilized, and consequently produce more sales, when taken to a competitive dealership if it were to be used by the salesman who compiled it. Furthermore, several dealerships, including the defendant, employ a practice of centralizing all their customer information and this central pool of information includes customer data which salesmen bring with them from former dealerships. Thus, although the defendant was purportedly never knowingly confronted with a salesman leaving to become a sales manager, it was aware that salesmen who left could give the customer information on their sales slips to their new dealership to be put to general use by the dealership. The defendant never made any attempt to prevent this practice though it produces the same result which the defendant claimed it feared.

 Apart from the evidence supporting a finding of legal malice, there was also evidence that the defendant was guilty of actual malice. Punitive damages are recoverable upon a showing of either actual or legal malice. Actual malice exists when one deliberately commits a wrongful act with the purpose of injuring another. *Labrier v. Anheuser Ford, Inc.*, 621 S.W.2d 51, 58 (Mo. banc 1981). The plaintiff testified that the discussion concerning his leaving became rather heated, and the defendant confiscated the plaintiff's records immediately following this discussion. The defendant refused to give the plaintiff an explanation for its withholding of the records, and when the plaintiff asked the president of Kribs Ford to return the records he replied, "the only way you can get your records is to sue me." The jury could reasonably conclude from this evidence that the defendant withheld the plaintiff's records out of spite because of the plaintiff's decision to leave.

Lastly, the defendant in its first point contends that the court erred in submitting MAI 3.01 (1981 Revision) to the jury without deleting the bracketed language "[or defense]" since no affirmative defense was raised. MAI 3.01 (1981 Revision) is a burden of proof instruction and reads as follows:

In these instructions, you are told that your verdict depends on whether or not you believe certain propositions of fact submitted to you. The burden of causing you to believe a proposition of fact is upon the party whose claim [or defense] depends upon that proposition. In determining whether or not you believe any such proposition, you must consider only the evidence and the reasonable inferences derived from the evidence. If the evidence in the case does not cause you to believe a particular proposition submitted, then you cannot return a verdict requiring belief of that proposition.

MAI 3.01 prior to the 1981 Revision was identical except there were no brackets around "or defense." The 1981 revision of MAI 3.01 became effective on March 1, 1981 and so was in effect at the time of the trial on June 22, 1981. The Notes on Use for the 1981 Revision of MAI 3.01 were approved on May 12, 1981, but did not become effective until January 1, 1982, six months after the lawsuit had been tried. The Notes on Use read as follows: "Use bracketed phrase when an affirmative defense is submitted."

 The court's burden of proof instruction was in complete conformance with the MAI instruction which was in effect at the time of trial, except that the instruction contained parenthesis instead of brackets around "or defense." The defendant does not contend that the court failed to reproduce the MAI burden of proof instruction effective at the time of trial, but rather it argues that the court should have known that the language in brackets was meant to be excluded when no affirmative defense is present, even though the Notes on Use so indicating were not then available.

Though the MAI burden of proof instruction used by the court is not phrased well and has since been improved, it was, nonetheless, not error for the trial court to use an authorized MAI instruction. *Moore v. Woolbright*, 645 S.W.2d 376, 377 (Mo.App. 1983). We are not persuaded to the contrary by the defendant's argument that the

court should have been aware of the intended use of the brackets before the Notes on Use became available, especially since the burden of proof instruction in use prior to the instruction used by the court did not even have brackets around the words "or defense" and was otherwise identical to the instruction used by the court. The defendant does not argue that the court erred in using parenthesis rather than brackets around "or defense," and we find no error in this minor alteration.

Affirmed.

STEPHAN, J., concurs.

SATZ, J., concurs in result.

SATZ, Judge, concurring.

I concur in the result reached by the majority. The existence of plaintiff's cause of action is supported by the holding and teaching of *Oster v. Kribs Ford, Inc.,* 611 S.W.2d 535 (Mo.1981). I question several of the premises and the reasoning in *Oster.* This court, however, is constrained to follow the last stated opinion of our Supreme Court.